JAMES S. THOMSON
California SBN 79658
Attorney and Counselor at Law
732 Addison Street, Suite A
Berkeley, California 94710
Telephone: (510) 525-9123
Facsimile:  (510) 525-9124
Email: james@ycbtal.net

KATHRYN ROSS
California SBN 171100
Attorney at Law
1611 Telegraph Avenue, Suite 806
Oakland, California 94612
Telephone: (415) 297-1262
Email: katie@kathrynrosslaw.com

Attorneys for Defendant
STEVEN CARRILLO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 4:20-cr-00265-YGR |
| Plaintiff, | **NOTICE OF COUNSELS' INABILITY TO CONSTITUTIONALLY PRESENT SERGEANT STEVEN CARRILLO'S DEATH PENALTY DECISION SUBMISSION BY THE UNREASONABLE DEADLINE ARBITRARILY IMPOSED BY THE GOVERNMENT AND INABILITY TO ACCURATELY ESTIMATE WHEN THEY CAN PRESENT THE SUBMISSION** |
| vs. | |
| STEVEN CARRILLO, | |
| Defendants. | **Date: October 28, 2020**<br>**Time: 2:00 P.M.** |
| | Judge: Hon. Yvonne Gonzalez Rogers |

Notice

# TABLE OF CONTENTS

I.     RELEVANT PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    PRESENTING A DEATH PENALTY DECISION SUBMISSION
       IS FACT INTENSIVE AND TIME CONSUMING. . . . . . . . . . . . . . . . . . . . . 5

III.   COUNSEL FOR SERGEANT CARRILLO ARE UNABLE TO MEET
       THE GOVERNMENT'S ARBITRARY AND UNREASONABLE
       DEATH PENALTY DECISION SUBMISSION DEADLINE. . . . . . . . . . . . . . 6

IV.    IMPEDIMENTS TO MEETING THE SUBMISSION DEADLINE. . . . . . . . . . 10

       A.     Discovery and Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       B.     Reality of Capital Casework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       C.     Reasonable Opportunity to Present. . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       D.     Local United States Attorney Presentation. . . . . . . . . . . . . . . . . . . . . 13

V.     THE COVID-19 PANDEMIC PARALYZES THE PARTIES' ABILITY
       TO PREPARE AND CONSIDER MITIGATION. . . . . . . . . . . . . . . . . . . . . . . 14

       A.     Foreword. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

       B.     Capital Defense Counsel Must Create a Client's Social History
              by Investigating Life History Witnesses and Collecting
              Documentary Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       C.     The Defense Team Must Conduct In-Person Mitigation Investigation
              and Have Contact Visits with Their Client. . . . . . . . . . . . . . . . . . . . . . 17

              1.     Mitigation Investigation Requires In-Person Investigation. . . . . . 18

              2.     The Pandemic Drastically Hinders  Counsel's Ability to Build
                     a Relationship with a Client Where Visits are Over the Phone
                     or by Video and Limited in Time. . . . . . . . . . . . . . . . . . . . . . . . . 19

       D.     Department of Justice Policies Mandate a Balanced Assessment of
              Mitigation and Aggravation as Part of the Decision to Seek Death. . . . . . 21

       E.     Summation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VI.    CASELAW REGARDING THE DEATH PENALTY DECISION
       SUBMISSION PROCESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       A.     Cases Finding Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

              1.     *United States v. Schlesinger.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

              2.     *United States v. Chavez and Skates.* . . . . . . . . . . . . . . . . . . . . . . 23

       B.     Cases Not Finding Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1.   *United States v. Crusius*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2.   *United States v. Urbina*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VII.   THE DEATH PENALTY DETERMINATION PROCESS CREATES
CONSTITUTIONAL RIGHTS FOR DEFENDANTS. . . . . . . . . . . . . . . . . . . . . 28

VIII.   CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**TABLE OF AUTHORITIES**

*Andrus v. Texas,* 140 S. Ct. 1875 (2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 17, 22

*Berger v. United States,* 295 U.S. 78 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Caldwell v. Mississippi,* 472 U.S. 320 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Doe v. Ayers,* 782 F.3d 425 (9th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Eaton v. Pacheco,* 931 F.3d 1009 (10th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Eaton v. Wilson, 09-CV-261-J,* 2014 WL 6622512 (2014). . . . . . . . . . . . . . . . . . . . . . 26

*Kimmelman v. Morrison,* 477 U.S. 365 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Mathews v. Eldridge,* 424 U.S. 319 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 28

*McCleskey v. Kemp,* 481 U.S. 279 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Morrissey v. Brewer,* 408 U.S. 471 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Porter v. McCollum,* 558 U.S. 30 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17

*Rompilla v. Beard,* 545 U.S. 374 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Strickland v. Washington,* 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . 6, 12, 18

*United States v. Esteves, CR 17-201,* 2018 WL 6817024 (2018). . . . . . . . . . . . . . . . . 14

*United States v. Hardrick, CRIM.A. 10-202,* 2011 WL 2516340 (2011). . . . . . . . . . . . 27

*United States v. Pena-Gonzalez,* 62 F.Supp.2d 358 (D.P.R. 1999). . . . . . . . . . . . . . . . 28

*United States v. Shakir,* 113 F. Supp. 2d 1182 (M.D. Tenn. 2000). . . . . . . . . . . . . . . . 27

*United States v. Slone,* 969 F. Supp. 2d 830 (E.D. Ky. 2013). . . . . . . . . . . . . . . . . . . . 27

*United States v. Tsarnaev, CRIM.A. 13-10200-GAO,* 2013 WL 5701582 (2013). . . . . . 27

*Wiggins v. Smith,* 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Williams v. Taylor,* 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Woodson v. North Carolina,* 428 U.S. 280 (1976.). . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**FEDERAL STATUTES**

18 U.S.C. § 3592(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11, 13, 16

18 U.S.C. § 3591. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 8

18 U.S.C. § 1114(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

JAMES S. THOMSON
California SBN 79658
Attorney and Counselor at Law
732 Addison Street, Suite A
Berkeley, California 94710
Telephone: (510) 525-9123
Facsimile:  (510) 525-9124
Email: james@ycbtal.net

KATHRYN ROSS
California SBN 171100
Attorney at Law
1611 Telegraph Avenue, Suite 806
Oakland, California 94612
Telephone: (415) 297-1262
Email: katie@kathrynrosslaw.com

Attorneys for Defendant
STEVEN CARRILLO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. **4:20-cr-00265-YGR** |
| Plaintiff, | **NOTICE OF COUNSELS' INABILITY TO CONSTITUTIONALLY PRESENT SERGEANT STEVEN CARRILLO'S DEATH PENALTY DECISION SUBMISSION BY THE UNREASONABLE DEADLINE ARBITRARILY IMPOSED BY THE GOVERNMENT AND INABILITY TO ACCURATELY ESTIMATE WHEN THEY CAN PRESENT THE SUBMISSION** |
| vs. | |
| STEVEN CARRILLO, | |
| Defendants. | **Date: October 28, 2020** <br> **Time: 2:00 P.M.** |
| | Judge: Hon. Yvonne Gonzalez Rogers |

TO THE HONORABLE COURT; COUNSEL FOR THE GOVERNMENT; AND

COUNSEL FOR DEFENDANT ROBERT JUSTUS, JR.:

Counsel for United States Air Force Sergeant Steven Carrillo formally provide

notice that they cannot meet the government's unilateral and arbitrary deadline to present

his death penalty decision submission to the United States Attorney for the Northern

District of California.

1    Save Mr. Justus' decision to exercise his right to litigate this matter, counsel for

2    Sergeant Carrillo would have continued to meet and confer with the government in an

3    attempt to reach an agreed upon submission schedule.  In that vein, on September 24,

4    2020, counsel for Sergeant Carrillo advised the government:

5        The purpose of our September 9, 2020 letter was to be as transparent as
         possible about the realities we face with regard to our submission. We
6        hoped our transparency would advance the discussion.

7        While it is true that we cannot provide you with a date in a vacuum given
         this unprecedented and uncertain time, we wanted to discuss ideas about
8        how we might move forward in a way that assuages your concern about an
         'indefinite' timeline."
9

10   September 24, 2020 Carrillo Letter, Attachment A.  But, by Mr. Justus pursuing litigation,

11   counsel felt compelled to file this notice as opposed to a motion.[1]

12   The notice is based on this notice and memorandum, attachments, the declaration

13   of counsel and the papers and records on file in this action.

14   **I.      RELEVANT PROCEDURAL HISTORY**

15   On June 16, 2020, the government filed a criminal complaint against Sergeant

16   Carrillo.  Doc #1.  The complaint charged Sergeant Carrillo with murder of a person

17   assisting an officer or employee of the United States Government (Count 1) and

18   attempted murder of a person assisting an officer or employee of the United States

19   Government (Count 2).  Id.

20   On June 23, 2020, Sergeant Carrillo made his initial appearance before the

21   Magistrate Court.  Doc #6.

22   On June 25, 2020, an indictment was filed in this case.  Doc #12.  Sergeant

23   Carrillo and Robert Justus, Jr. are charged with first degree murder of a person assisting

24   an officer or employee of the United States Government and aiding and abetting the same

25   in violation of 18 U.S.C. sections 1114(1) and 2(a) (Count 1) and attempted murder of a

26   person assisting an officer or employee of the United States Government and aiding and

27   _____

28   [1] In that regard, that is why the stipulated "briefing" schedule includes "pleading."
     Doc #35 at 1.

Notice

1   abetting the same in violation of 18 U.S.C. sections 1114(3), 1111, and 2(a) (Count 2).

2   Id. at 1-2.  Special findings are alleged as to Count 1 under 18 U.S.C. section 3591(a),

3   (a)(2)(A), (a)(2)(B), (a)(2)(c), and (a)(2)(D).

4       On July 2, 2020, the Magistrate Court appointed James Thomson as counsel for

5   Sergeant Carrillo.  Doc #18.  That same day, Sergeant Carrillo was arraigned and entered

6   pleas of not guilty to all charges.  Id.  The court set a status conference for August 6, 2020

7   before this Court.  Id.  The status conference was later changed to August 19, 2020.  Doc

8   #26.

9       On July 8, 2020, this Court appointed Mr. Thomson as lead and learned counsel

10  for Sergeant Carrillo.  Doc #22.

11      On July 30, 2020, the government requested that Sergeant Carrillo provide his

12  death penalty decision submission (submission) no later than September 15, 2020 so that

13  it could provide its recommendation to the Department of Justice's Capital Case Review

14  Committee (Committee) by September 28, 2020.  July 30, 2020 Government Letter;

15  United States Justice Manual, section 9-10.080 and subsection F.

16      On August 19, 2020, a status conference was held and a further status conference

17  was set for October 28, 2020.  Doc #31.

18      Following the status conference, counsel for Sergeant Carrillo and the government

19  exchanged dates for scheduling a meet and confer session regarding the submission.  The

20  scheduling was complicated somewhat due to prior commitments and travel plans of the

21  respective attorneys.  Nevertheless, defense counsel were confidant that a meeting could

22  be scheduled.

23      On August 21, 2020, the government asked if an extension to November 12, 2020

24  would allow Sergeant Carrillo time to present his submission.  August 21, 2020

25  Government Email.

26      On August 26, 2020, counsel responded to the government August 21, 2020 email

27  asking "to meet and confer about the timing of defense mitigation presentations."  August

28  26, 2020 Carrillo Letter.

Notice

1      On September 1, 2020, this Court appointed Kathryn Ross as second counsel for

2  Sergeant Carrillo.  Doc #32.

3      On September 4, 2020, the government advised defense counsel:

4      I understand that we have been unable to schedule a meet and confer ahead
of the existing deadline of September 28 for the submission of the local
5      recommendation as part of the DOJ's Death Penalty Protocol.  While we
continue to try to align our schedules, I thought I would try to move our
6      conversation forward here in email.  Are you able to give us an estimate of
when you would be ready to make a local defense mitigation presentation?
7      Are you willing to give us any indication of what we would learn from
your presentation if we were to push back the deadline?  Thank you very
8      much for your consideration of these questions.

9  September 4, 2020 Government Email.

10      On September 5, 2020, counsel for Sergeant Carrillo learned that counsel for Mr.

11  Justus had determined to file a motion regarding the scheduling of the deadline for

12  presenting their submission.

13      Following the Labor Day Holiday, on September 8, 2020, counsel for Sergeant

14  Carrillo responded to the government's September 4, 2020 email: "Katie [Ross] and I will

15  respond more fully to your suggestion now that the holiday is behind us.  Our initial

16  thought is that we should really strive to meet via zoom when our schedules permit."

17  September 8, 2020 Carrillo Email.

18      On September 9, 2020, counsel for Sergeant Carrillo sent a letter to the

19  government detailing why an in-person zoom meeting was preferable to a simple

20  exchange of emails given the importance of the matter.  September 9, 2020 Carrillo

21  Letter; Doc #33-1.

22      On September 10, 2020, the government wrote a letter to counsel for Mr. Justus

23  and Sergeant Carrillo indicating that it did "not see a way that we may find common

24  ground" on the scheduling of the submission.  September 10, 2020 Government Letter;

25  Doc #33-2.  The government asked to be informed "if [defense counsel] intend to bring

26  motion practice on this matter, and if [they] do, when [they] intend to file."  Id.  The

27  government suggested a "hearing date of October 28, 2020."  Id.  Moreover, "[a]s part of

28

Notice

1  such an agreed-upon briefing schedule, we would agree not to make our local

2  recommendation before October 28."  Id.

3      That day, counsel for Sergeant Carrillo learned that counsel for Mr. Justus

4  informed the government that it would file a motion.

5      On September 11, 2020, counsel for Sergeant Carrillo filed a status report

6  regarding the meet and confer process concerning his death penalty decision submission.

7  Doc #33.

8      On September 24, 2020, the parties filed a stipulation regarding the briefing

9  schedule for motions to be filed by defendants regarding the timing of the United States

10  Attorney's recommendation on whether to seek the death penalty in this case.  Doc #34.

11  On September 24, 2020, this Court granted the stipulation and imposed the schedule.

12  Doc #35.

13      That same day, counsel for Sergeant Carrillo wrote to the government seeking

14  further meet and confer sessions to address and resolve this matter short of litigation.

15  September 24, 2020 Carrillo Letter, Attachment A.

16  **II.   PRESENTING A DEATH PENALTY DECISION SUBMISSION
       IS FACT INTENSIVE AND TIME CONSUMING**

17

18      In Sergeant Carrillo's September 9, 2020 letter to the government, counsel noted

19  that a death penalty decision submission: "requires a comprehensive investigation into

20  Sergeant Steven Carrillo's social history, medical history and, here, military history.

21  Suffice it to say that it is no small task in the simplest of cases and this case is far from

22  simple."  September 9, 2020 Carrillo Letter at 2; Doc #33-1.

23      In order to assist the government in understanding the magnitude of the tasks

24  counsel must undertake "to fulfill [our] Sixth Amendment mandate to provide effective

25  assistance," counsel provided the government with copies of the American Bar

26  Association Guidelines for the Appointment and Performance of Defense Counsel in

27  Death Penalty Cases (Revised Edition, February 2003); C. Haney, Evolving Standards of

28  Decency: Advancing the Nature and Logic of Capital Mitigation, Hofstra Law Review

Notice

5

1   (Spring 2008) R. Stetler, The Past, Present, and Future of the Mitigation Profession:

2   Fulfilling the Constitutional Requirement of Individualized Sentencing in Capital Cases

3   (Summer 2018); and the American Bar Association Supplementary Guidelines for the

4   Mitigation Function of the Defense Team in Death Penalty Cases (2008)."  September 9,

5   2020 Carrillo Letter; Doc #33-1 at 1.

6       Counsel explained that the amount of work required to prepare a proper death

7   penalty decision submission "is precisely why the USJM provides that 'the United States

8   Attorney or Assistant Attorney General shall give counsel for the defendant a reasonable

9   opportunity to present information for the consideration of the United States Attorney or

10   Assistant Attorney General which may bear on the decision whether to seek the death

11   penalty.' USJM section 9-10.080."  September 9, 2020 Carrillo Letter; Doc #33-1 at 2.

12   **III.   COUNSEL FOR SERGEANT CARRILLO ARE UNABLE TO MEET THE
         GOVERNMENT'S ARBITRARY AND UNREASONABLE DEATH**
13   **PENALTY DECISION SUBMISSION DEADLINE.**

14       Counsel are not aware of any mandate that requires the local United States

15   Attorney to submit its local recommendation to the Department of Justice (Department)

16   by a precise date.  The USJM - as it relates to the prosecution of capital crimes - does not

17   impose a deadline for the local submission.  See USJM Section 9-10.000 - Capital

18   Crimes.  Rather, the USJM provides that "[t]he overriding goal of the review process is to

19   allow proper individualized consideration of the appropriate factors relevant to each

20   case."  Section 9-10.030.  "Fairness requires all reviewers to evaluate each case on its

21   own merits and on its own terms."  Section 9-10.140.

22       In that regard, death penalty case law is clear that counsel is duty bound to

23   investigate the case before acting in a way that could jeopardize the client.  *Strickland v.*

24   *Washington*, 466 U.S. 668, 690–91 (1984); *Kimmelman v. Morrison*, 477 U.S. 365, 384

25   (1986).

26       As early as 1979, defense counsel were under "the duty" to conduct a "prompt

27   investigation of the circumstances of the case and to explore all avenues leading to facts

28   relevant to the merits of the case and the penalty in the event of conviction."  1979

Notice

6

1    American Bar Association Guideline 4-4.1.  This duty requires counsel to make "efforts

2    to discover all reasonably available . . . evidence to rebut any aggravating evidence that

3    may be introduced by the prosecutor."  1989 American Bar Association Guideline

4    11.4.1.C.  And, "if what counsel knows or should know suggests that further investigation

5    might yield more mitigating evidence, counsel must conduct that investigation."  *Doe v.*

6    *Ayers*, 782 F.3d 425, 435 (9th Cir. 2015).

7         Capital cases require "extensive and generally unparalleled investigation into

8    personal and family history."  2003 ABA Guidelines, 10.7, Commentary.  At a minimum,

9    this investigation must include a review of the defendant's (1) medical history; (2) family

10   and social history; (3) educational history; (4) military service; (5) employment and

11   training history; and (6) prior juvenile and adult correctional experience*. Id.*  The defense

12   must obtain all potentially relevant social history information pertaining to the defendant

13   and his family.  American Bar Association Guideline 10.7.

14        Accordingly, counsel must gather: (1) school records; (2) social service and

15   welfare records; (3) juvenile dependency or family court records; (4) medical records; (5)

16   employment records; (6) criminal and correctional records; (7) family birth, marriage, and

17   death records; (8) alcohol and drug abuse assessment or treatment records; and (9)

18   records pertaining to immigration and citizenship status.  American Bar Association

19   Guideline 10.7.  These records are crucial to verifying or corroborating witness testimony

20   about circumstances and events in the defendant's life.

21        Social history records will document events that neither the client nor family

22   members remember.  *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 395 n.19 (2000) (relying

23   on a social worker's graphic description of the Williams home that could not have been

24   provided by client, who was too young, or the adult family members, who were too

25   intoxicated, to recall the scene).  Importantly, mitigation investigators and experts can

26   work only as fast as the relevant agencies process and release these records.  Thus,

27   considerable time is required to obtain the full panoply of the requested information.

28   Only then can the investigation truly commence.

Notice

7

1    As noted forty years ago, "[t]he lawyer . . . has a substantial and important role to

2    perform in raising mitigating factors both to the prosecutor initially and to the court at

3    sentencing.  This cannot effectively be done on the basis of broad general emotional

4    appeals or on the strength of statements made to the lawyer by the defendant.  Information

5    concerning the defendant's background, education, employment record, mental and

6    emotional stability, family relationships, and the like, will be relevant, as will mitigating

7    circumstances surrounding the commission of the offense itself.  Investigation is essential

8    to fulfillment of these functions."  1979 American Bar Association Guideline 4-4.1,

9    commentary (cited in *Williams*, 529 U.S. at 398; and *Wiggins v. Smith*, 539 U.S. 510, 524

10   (2003)).

11   In reaching a decision whether to seek the death penalty, the local United States

12   Attorney is required to provide certain information to the Committee.  USJM 9-10.140.

13   The USJM requires the local memorandum to include the following information:

14   (1)    Any deadline established by the Court for the filing of a notice of intent to

15   seek the death penalty, trial dates, or other time considerations that could affect the timing

16   of the review process should be noted on the first page of the memorandum.

17   (2)    A narrative delineation of the facts and separate delineation of the

18   supporting evidence.  Where necessary for accuracy, a chart of the evidence by offense

19   and offender should be appended.

20   (3)    Discussion of relevant prosecutorial considerations.

21   (4)    Death penalty analysis.  The analysis must identity applicable threshold

22   intent factors under 18 U.S.C. § 3591, applicable statutory aggravating factors under 18

23   U.S.C. §§ 3592(b)-(d), and applicable mitigating factors under 18 U.S.C. § 3592(a).  In

24   addition, the United States Attorney or Assistant Attorney General should include his or

25   her conclusion on whether all the aggravating factor(s) found to exist sufficiently

26   outweigh all the mitigating factor(s) found to exist to justify a sentence of death, or in the

27   absence of mitigating factors, whether the aggravating factor(s) alone are sufficient to

28

Notice

justify a sentence of death.  The analysis should also include a discussion of the standards

for determination as set forth in USJM 9-10.140.

(5)     Background and criminal record of the capital-eligible defendants.

(6)     Background and criminal record of the victim.

(7)     Victim impact.  Views of the victim's family on seeking the death penalty

and other victim impact evidence should be provided.

(8)     Discussion of the federal interest in prosecuting the case.

(9)     Foreign citizenship.  The memorandum should include a discussion on

whether the requirements of the Vienna Convention on Consular Relations have been

satisfied (*see* JM 9-2.173 and Fed. R. Crim. Pro. 5(d)(1)(F) regarding consular

notification when foreign nationals are arrested).

(10)    Recommendation of the United States Attorney or Assistant Attorney

General on whether the death penalty should be sought.

USJM 9-10.140.

In determining whether it is appropriate to seek the death penalty, the Committee

"will determine whether the applicable statutory aggravating factors and any

non-statutory aggravating factors sufficiently outweigh the applicable mitigating factors

to justify a sentence of death or, in the absence of any mitigating factors, whether the

aggravating factors themselves are sufficient to justify a sentence of death."  USJM 9-

10.140.  In reaching a decision, the United States Attorney, the Committee, and the

Attorney General "may consider any legitimate law enforcement or prosecutorial reason

that weighs for or against seeking the death penalty."  Id.

Under the USJM protocol, these considerations include:

(1)     The strength and nature of the evidence;

(2)     The relative roles in the offense of defendants in jointly undertaken criminal

activity;

(3)     Whether the offense was intended to obstruct justice or was otherwise

Notice

9

1   motivated by the victim's cooperation with law enforcement or the belief that the victim

2   was cooperating with law enforcement;

3   (4)   Whether the offense was committed to retaliate against a third-party for

4   cooperating with law enforcement or against a third party believed to be cooperating with

5   law enforcement;

6   (5)   Whether the victim engaged in criminal activity that was a relevant

7   circumstance of the offense;

8   (6)   Whether a defendant engaged in criminal activity for which he had not been

9   held accountable;

10   (7)   Whether the defendant is already serving a substantial sentence such that an

11   additional sentence of incarceration would have little punitive impact;

12   (8)   Whether the defendant has a history of infractions or offenses while

13   incarcerated; and

14   (9)   Whether the defendant has accepted responsibility for his conduct as

15   demonstrated by his willingness to plead guilty and accept a life or near-life sentence

16   without the possibility of release.

17   USJM 9-10.140.

18   In fairness, Sergeant Carrillo should be able to present parallel and counter

19   information on these various matters to the United States Attorney.  For the government

20   to now ask Sergeant Carrillo to accelerate everything in play and make a life or death

21   presentation, in such a short time is irresponsible, violative of due process and equal

22   protection and rips at the heart of the Sixth and Eighth Amendments.  In short, it is

23   impossible to effectively accomplish these tasks by the government's imposed deadline.

24   **IV.   IMPEDIMENTS TO MEETING THE SUBMISSION DEADLINE**

25   Most importantly, undersigned counsel were not appointed by this Court until July

26   8, 2020 and September 1, 2020, respectively.  Docs #22 and #32.

27

28

Notice

**A.      Discovery and Investigation**

Six productions of discovery have been delivered: July 17, and August 4, 14, 19, and 26, and September 25, 2020.  In total, 81,737 pages, 4,559 photos, 131 videos, 13 audios, and 8 device extraction folders have been produced.  The September 25, 2020 production is expected to be delivered on September 28, 2020.  At this time, there are seven Carrillo discovery letters awaiting the government's response.  More will likely follow as the discovery is reviewed.

At the August 19, 2020 status conference, counsel advised the government and notified the Court that the amount of discovery will require a very large amount of time to just review - let alone analyze - it, develop witness lists and an investigation plan, meet with experts and become knowledgeable of the case facts.  Nevertheless, the Carrillo team has been diligently pursuing these tasks.

The case investigation, retaining and initially consulting with experts and related service providers did not start until the end of August.  And, while on-going, the defense case is not beyond the beginning stage of discovery and document review and witness identification.

**B.      Reality of Capital Casework**

In the meet and confer process, counsel informed the government that "other than providing [it] with the time lines established in other cases in the district, we cannot truly give you an estimate of when we "would be ready to make a local defense mitigation presentation."  September 9, 2020 Carrillo Letter; Doc #33-1 at 3.  Counsel explained that to do so at this point, would be foolish and unprofessional.  "We are at the beginning of the case.  We have yet to meet our client in person.  Ms. Ross and I have yet to meet in person.  We have yet to have a team meeting in person.  We only recently received the initial production of mitigation discovery from you. . . . . In short, we have just begun our work."  Id.

1    Counsel noted that capital defense practice requires considerable work, citing

2   *Andrus v. Texas*, 140 S. Ct. 1875, ___U.S. ___ (June 15, 2020).  In *Andrus*, the Supreme

3   Court just recently found trial counsel ineffective under *Strickland*.  The Court held:

4        "It is unquestioned that under prevailing professional norms at the time of
         [*Andrus'*] trial, counsel had an 'obligation to conduct a thorough
5        investigation of the defendant's background.'" *Porter v. McCollum*, 558
         U. S. 30, 39 (2009) (per curiam) (quoting *Williams v. Taylor*, 529 U. S.
6        362, 396 (2000)).  Counsel in a death-penalty case has "'a duty to make
         reasonable investigations or to make a reasonable decision that makes
7        particular investigations unnecessary.'" *Wiggins v. Smith*, 539 U. S. 510,
         521 (2003) (quoting *Strickland*, 466 U. S., at 691). *Andrus*, 140 S.Ct. 1881.
8

9        The Court found that trial counsel "fell short of his obligation in multiple ways:

10   First, counsel performed almost no mitigation investigation, overlooking vast tranches of

11   mitigating evidence.  Second, due to counsel's failure to investigate compelling

12   mitigating evidence, what little evidence counsel did present backfired by bolstering the

13   State's aggravation case.  Third, counsel failed adequately to investigate the State's

14   aggravating evidence, thereby forgoing critical opportunities to rebut the case in

15   aggravation.  Taken together, those deficiencies effected an unconstitutional abnegation

16   of prevailing professional norms." *Andrus*, 140 S.Ct. 1882.

17       While *Andrus* addresses the effectiveness of counsel in the trial setting, the same

18   guiding principles apply at the decision submission stage.  Indeed, it may be more

19   important at this critical threshold life or death stage.

20       In responding to the government's request for the type of information counsel

21   could provide, counsel wrote that "we are glad to give you an "indication of what [you]

22   would learn from []our presentation if [you] were to push back the deadline", if we could

23   do so.  We can only say now what you, and the public, already know - Sergeant Carrillo

24   has no criminal history and has devoted his professional life to the service of our

25   country."  September 9, 2020 Carrillo Letter; Doc #33-1 at 4.  Indeed, since September 9,

26   2020, the government has advised counsel that Sergeant Carrillo does not have any prior

27   arrests or convictions.  Government September 16, 2020 Letter.

28

Notice

12

### C.   Reasonable Opportunity to Present

As earlier mentioned, the USJM requires that the government give a defendant "a reasonable opportunity to present information for the consideration of the United States Attorney or Assistant Attorney General which may bear on the decision whether to seek the death penalty." Section 9-10.080. Only "[a]fter the conclusion of a reasonable period of time," is the local United States Attorney required to "submit to the Assistant Attorney General for the Criminal Division through the Capital Case Section [his] recommendation whether to seek the death penalty, along with [various] materials...." Id.

The materials the United States Attorney is required to provide speak volumes about why the timing is controlled by reasonableness, not arbitrary deadlines. The local United States Attorney's submission must include a death penalty analysis, which requires the identification of "applicable mitigating factors under 18 U.S.C. § 3592(a)" and his "conclusion on whether all the aggravating factor(s) found to exist sufficiently outweigh all the mitigating factor(s) found to exist to justify a sentence of death, or in the absence of mitigating factors, whether the aggravating factor(s) alone are sufficient to justify a sentence of death." USJM, section 9-10.080(4).

The death penalty analysis should be informed by the "[m]aterials provided by defense counsel." Section 9-10.080. Moreover, "[t]he analysis employed in weighing the aggravating and mitigating factors should be qualitative, not quantitative: a sufficiently strong aggravating factor may outweigh several mitigating factors, and a sufficiently strong mitigating factor may outweigh several aggravating factors." USJM, section 9-10.040 C.

### D.   Local United States Attorney Presentation

Importantly, the place to best present the case for life is with the local United States Attorney. The "Spencer Report" notes that "since the local prosecutor's recommendation most often prevails with the Attorney General, the opportunity to persuade the U.S. Attorney not to request capital authorization is extremely important." Hon. James R. Spencer, et al., Committee on Judicial Services of the Judicial Conference

Notice

13

of the United States, Subcommittee on Federal Death Penalty Cases, Federal Death Penalty Cases: Recommendations Concerning the Cost And Quality of Defense Representation at 93 (May 1998) (adopted by the Judicial Conference of the United States on Sept. 15, 1998).[2]

Without his recommendation, there is little to no chance of convincing the Department to not seek death in this case.  And, once the death decision is made, it is a rare case when the Department will overturn the decision with the presentation of a supplemental decision submission.  Even so, the process for doing so, is an uphill battle at best.  See USJM section 9-10.160 - Withdrawal of the Notice of Intention to Seek the Death Penalty.

## V.   THE COVID-19 PANDEMIC FREEZES THE PARTIES' ABILITY TO PREPARE AND CONSIDER MITIGATION.

### A.   Foreword

The COVID-19 (Coronavirus Disease) outbreak remains a national public health emergency with now over 200,000 American lives lost, the disruption of our daily lives, economic turmoil and uncertainty.  By all accounts, the pandemic will worsen as the flu season approaches.

Shortly after the President declared a National Emergency on March 13, 2020, on March 16, 2020, the Northern District of California issued General Order 72.  That order included the suspension of all criminal jury trials until May 1, 2020, and the across-the-board exclusion of time under the Speedy Trial Act.  The Order also consolidated all criminal matters to the San Francisco Division.  General Order 73, issued on that same day, severely limited access to all four of the Northern District Courthouses.  Pursuant to

---

[2]  The Spencer Report examines "the cost, quality, and availability of defense representation" in federal capital cases and "presents information on the authorization, defense, and management of federal capital cases."  Spencer Report at 1-2.  The report "provides useful information and recommendations to courts on conducting and managing capital cases." *United States v. Esteves*, CR 17-201, 2018 WL 6817024, at *5 n.17 (E.D. La. Dec. 27, 2018).

Notice

1   the "CARES ACT", the Northern District issued General Order 74 on March 30, 2020

2   and reauthorized on September 16, 2020.  This order authorized video or telephonic

3   hearings in place of in-person appearances.

4         With few exceptions, criminal jury trials have remained suspended through

5   September 30, 2020.[3]  Their resumption will be very limited in scope because of the need

6   to socially distance.  The restrictions which prohibit in-person criminal appearances and

7   inmate transportation from Santa Rita Jail continue.  The vast majority of criminal

8   proceedings occur by way of video and telephonic appearances.  In the select cases where

9   a defendant may appear in person, that appearance happens at a social distance, masked,

10  at least six-feet away from counsel.  Thus, a defendant must face the enormity of federal

11  court standing alone, or, if incarcerated, isolated in a video conference room - situations

12  which prevent their attorneys from offering real-time counsel.

13        The disruption in the operation of criminal justice in the Northern District of

14  California has had a profound impact on incarcerated defendants.  In- person family visits

15  have been suspended, and video visits with family are limited.  Calls can be prohibitively

16  expensive.  Attorney visits only happen over the phone and by way of "Zoom"

17  conferencing.  These visits generally require planning a week in advance and are of

18  limited duration.  The only electronically reliable video connection exists on the weekend,

19  and is staged in a windowed booth that is not sound-proof, with guards and other inmates

20  passing by sporadically.

21        The pandemic also creates an insurmountable impediment to the ability to

22  investigate.  Because of time and security restrictions, meaningful review of discovery is

23

24

----

25       [3]  General Order 72-4, issued on June 24, 2020,  called for the limited
     commencement of criminal jury trials.  That order was superseded on July 23, 2020 by
26   General Order 72-5, which again suspended all new jury trials through September 30,
     2020.  That order was superseded on September 16, 2020 by General Order 72-6, which
27   provides that "jury trial may proceed in accordance with logistical considerations
     necessitated by the Court's safety protocols."
28

Notice

15

1    impossible during jail "visits".  Social distancing renders in-person interviews of

2    witnesses potentially dangerous and inherently ill-advised.

3        In short, the pandemic has severely undermined Fifth and Sixth Amendments,

4    particularly an attorney's ability to provide effective representation.

5        Added to this constitutional quagmire is the fact that, even in a "normal" world,

6    death is different.  "Death, in its finality, differs more from life imprisonment than a 100-

7    year prison term differs from one of only a year or two.  Because of that qualitative

8    difference, there is a corresponding difference in the need for reliability in the

9    determination that death is the appropriate punishment in a specific case. *Woodson v.*

10   *North Carolina*, 428 U.S. 280, 305 (1976.).  "With it, we deny the convict any possibility

11   of rehabilitation and order instead his execution, the most irrevocable of sanction (cite).

12   Its severity demands a heightened need for reliability in the determination that death is

13   appropriate punishment in a specific case." *United States v. Gomez-Olmeda,* 296

14   F.Supp.2nd 71, 90 citing *Caldwell v. Mississippi,* 472 U.S. 320, 323 (1985).

15       Constitutional jurisprudence, professional standards of responsibility, and the rules

16   governing federal prosecutors, set a high bar for attorneys in death penalty cases.  Under

17   the current landscape, and that of the foreseeable future, a dire consequence of the

18   pandemic is that no capital attorney can meet that bar.

19       **B.    Capital Defense Counsel Must Create a Client's Social History by
            Investigating Life History Witnesses and Collecting Documentary**
20       **Evidence.**

21       The Supreme Court requires that capital defense counsel, as part of the statutorily

22   required role of presenting mitigation, develop a client's social history.  18 U.S.C.

23   §3592(a).  This occurs through mitigation investigation.  The investigation involved in

24   compiling a social history must include the collection of documentary evidence and a

25   comprehensive investigation of live witnesses who can credibility describe a client's

26   social history.

27       In *Williams v. Taylor*, 529 U.S. 362 (2000), the Court concluded that counsels'

28   performance fell below professional norms because they failed to investigate Mr.

Notice

16

1  Williams abusive childhood. *Id.* at 395.  In *Wiggins v. Smith*, 539 U.S. 510 (2003), the

2  Court found that counsel rendered ineffective assistance of counsel for failing to compile

3  an adequate social history. *Id.* at 538.  Counsels' performance was constitutionally

4  deficient for failing to "uncover and present voluminous mitigation" of the defendant's

5  background of horrific abuse. *Id. at 522.*

6  The Supreme Court's *per curiam* decision in *Porter v. McCollum*, 558 U.S. 30

7  (2009), gives another example trial counsel's duty to diligently investigate life history

8  witnesses.  The Court found that trial counsel's performance was prejudicially deficient,

9  for failing to present evidence of the defendant's military service, mental health and abuse

10  as a child. *Id.* at 33-34.  To emphasize the deficiency and resulting prejudice, the

11  Supreme Court discussed at length the testimony offered by Porter's company

12  commander from the Korean War, who recounted Porter's military service. *Id.* at 35-36.

13  Mitigation evidence clearly falls prey to erroneous conclusions if it is not

14  thorough.  Indeed, if incomplete, its use can backfire.  As noted, the recent *per curium*

15  decision in *Andrus,* highlights the danger of presenting incomplete mitigation.  There, the

16  Supreme Court found trial counsel deficit for disregarding "numerous red flags". *Id*. at

17  1883.  The Court concluded, "No doubt due to counsel's failure to investigate the case in

18  mitigation, much of the so-called mitigating evidence he offered unwittingly aided the

19  State's case in aggravation." *Id.*

20  While Sergeant Carrillo's defense team is working and will work diligently to

21  collect relevant life records, social distancing and travel restrictions render impossible the

22  constitutionally mandated investigation required to develop an accurate social history.

23  **C.    The Defense Team Must Conduct In-Person Mitigation Investigation and Have Contact Visits with Their Client.**

24

25  The defense team is obligated to follow the Guidelines that have been set by the

26  American Bar Association for representation in a capital case.  See 2003 ABA Guidelines

27  and 2008 ABA Supplementary Guidelines.  The Supreme Court has explicitly recognized

28  that the ABA Guidelines provide appropriate guidance to determine what is reasonable in

Notice

1   a criminal case.  (*See e.g.: Strickland*,  466 U.S. at 688, prevailing norms of practice, as

2   reflected in standards such as the ABA Standards for Criminal Justice, are guides to

3   determine what is reasonable; *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005),

4   discussing the 1989 and 2003 version of the ABA Death Penalty Case Guidelines in

5   reversing the denial of habeas corpus relief; *Wiggins*, 539 U.S. at 524, noting that

6   counsel's conduct "fell short" of "the guide[s] to determining what is reasonable" set

7   forth in the ABA Guidelines.)

8          The global pandemic severely freezes, if not entirely prevents, a capital attorney's

9   ability to meet the ABA Guidelines' mandates.  Of specific concern are those that pertain

10  to a capital defense counsel's relationship to a client and the duty to conduct in-person

11  mitigation investigation.

12                **1.      Mitigation Investigation Requires In-Person Investigation.**

13          Mitigation investigation requires a deep probe into intimate, and often shame-

14  inducing details of a defendant's history:

15          "[T]he vast majority of the men and women who are charged with or
            convicted of capital crimes have backgrounds of violence, abuse, and
16          neglect.  As an essential part of any capital case investigation, families that
            have carefully hidden shameful secrets of incest, abuse, alcoholism, and
17          mental illness for generations must now be persuaded to disclose these
            details.  It is a difficult and intimidating process.  These are not secrets that
18          will be revealed to strangers on the first visit, or even perhaps the third or
            fourth.  Yet the damaging and destructive nature of these secrets is the very
19          evidence that might convince a jury to spare a client's life."

20  Robin M. Maher, *The ABA and the Supplementary Guidelines for the Mitigation Function

21  of Defense Teams in Death Penalty Cases*, 36 Hofstra Law Review 763, 771.

22          It is precisely because of the delicate nature of these interviews that the 2008

23  Supplementary Guidelines require in person mitigation investigation.  Rule 10.11, *The

24  Defense Case: Requisite Mitigation Function of the Defense Team* states, in part:

25          B. The defense team must conduct an ongoing exhaustive and independent
            investigation of every aspect of the client's character, history, record and
26          any circumstances of the offense, or other factors, which may provide a
            basis for a sentence less than death.  The investigation into a client's life
27          history must survey a broad set of sources…

28

Notice

1  C. Team members must conduct in-person, face-to-face, one-on-one
2  interviews with the client, the client's family, and other witnesses who are
   familiar with the client's life, history, or family history or who would
3  support a sentence less than death. Multiple interviews will be necessary
   to establish trust, elicit sensitive information and conduct a thorough and
4  reliable life-history investigation. Team members must endeavor to
   establish the rapport with the client and witnesses that will be necessary to
5  provide the client with a defense in accordance with constitutional
   guarantees relevant to a capital sentencing proceeding.

6  The requirement of in-person interviews evolves from experience that "taught []that the

7  best mitigation evidence was found on front porches with family members, and in

8  discussions with school teachers who remembered the neglected and abused children

9  from their classes years earlier."  36 Hofstra Law Review 763, 768.

10  In the age of COVID, where video conferencing attempts to serve as a substitute

11  for in- person meetings, a "Zoom" meeting cannot serve as a substitute for mitigation

12  investigation.  Yet, meeting with strangers during the pandemic not only violates the

13  explicit advice of national public health authorities, trying to make in-person connections

14  with witnesses potentially sabotages the relationship with that witness, because it could be

15  perceived as showing disregard for them and their families' safety.

16  In Sergeant Carrillo's case, the indictment issued during the pandemic.

17  Consequently, no pre-existing relationships, where trust had already been built through

18  in-person contact, existed when the county shut down.  As a result, any meaningful and

19  reliable mitigation investigation cannot occur while social distancing and travel

20  restrictions remain in place.

21  **2.  The Pandemic Drastically Hinders  Counsel's Ability to Build a
22  Relationship with a Client Where Visits are Over the Phone or
   by Video and Limited in Time.**

23  The pandemic has likewise changed the landscape of the attorney/client

24  relationship in capital defense.

25  ABA Guideline 10.5 sets forth the standards for the attorney/client relationship in

26  a capital case.  Primarily, "[c]ounsel at all stages of the case should make every

27  appropriate effort to establish a relationship of trust with the client and should maintain

28  close contact with the client." ABA Guideline 10.5(A).  This obligation extends beyond

Notice

19

1  updates and legal advice.  The commentary to the rule explains:

2      Establishing a relationship of trust with the client is essential both to
3      overcome the client's natural resistance to disclosing the often personal and
       painful facts necessary to present an effective penalty phase defense, and
       to ensure that the client will listen to counsel's advice on important matters
4      such as whether to testify and the advisability of a plea.  **[Cite]** Client
       contact must be ongoing, and include sufficient time spent at the prison to
5      develop a rapport between attorney and client. An occasional hurried
       interview with the client will not reveal to counsel all the facts needed to
6      prepare for trial, appeal, post-conviction review, or clemency. Even if
       counsel manages to ask the right questions, a client will not—with good
7      reason—trust a lawyer who visits only a few times before trial, does not
       send or reply to correspondence in a timely manner, or refuses to take
8      telephone calls.  It is also essential to develop a relationship of trust with
       the client's family or others on whom the client relies for support and
9      advice.

10 31 Hofstra L. Rev. 913, 1008.

11      In a normal world, building this relationship of trust involves regular, in- person

12 "contact" visits, both one-on-one and with the members of the defense team.[4]  Because of

13 the restriction on visits, Sergeant Carrillo has met no one from his team in person.

14 Needless to say, it challenging, at best, to build rapport at a distance, on a screen.  These

15 visits are limited in time.  It is not possible to see a person's facial expressions in the

16 staging room and thus, these visits inhibit meaningful dialogue, the opportunity to

17 observe reactions, or follow-up on those reactions.  This not only undermines the ability

18 to build trust on legal issues, but visits with counsel and the team's also serve as a starting

19 point for delving into sensitive issues that inform the mitigation investigation.

20      Mitigation investigation cannot be compartmentalized into a "penalty phase" box.

21 Mitigation investigation serves as a foundation for trial counsel's strategy concerning

22 motions practice, jury selection, the selection of experts, the focus of the guilt phase and

23 many other critical aspects of the defense case.

24

25 ─────────────────────
       [4]  Attorney "Contact" visits differ from public jail visits. In a contact visit, the
26 client and counsel are in a room without any physical barriers.  Counsel can sit next to a
   client, and discovery and mitigation documents can be shared.  A public visit occurs
27 through a glass barrier on a phone.  Attorney contact visits remain suspended at Santa
   Rita.
28

Notice
                                    20

**D.    Department of Justice Policies Mandate a Balanced Assessment of Mitigation and Aggravation as Part of the Decision to Seek Death.**

"The prosecutor, as the representative of an impartial sovereign, has the peculiar obligation not necessarily to win a case, but to assure that justice is done. 'He may prosecute with earnestness and vigor- indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is every much his duty to refrain from improper methods calculated to produce  a wrongful conviction as it is to use every legitimate means to bring about a just one."

*United States v. Gomez-Olmeda*, 296 F.Supp.2nd 71 (Northern District of Puerto Rico, 2001), citing *Berger v. United States,* 295 U.S. 78, 88 (1935).

Given this solemn duty, and that death is different, the Department appropriately devotes an entire chapter of its "Justice Manual" to set forth the policies and procedures for all Federal cases in which a defendant is charged, or could be charged, with an offense subject to the death penalty.  USJM 9-10.010.  As earlier noted, but well worth repeating, its purpose statement proclaims: "The overriding goal of the review process is to allow proper individualized consideration of the appropriate factors relevant to each case" USJM 9-10.030.

"Fairness requires all reviews to evaluate each case on its own merits and on its own terms." USJM 9-10.140.  The Manual contains directives to ensure a thorough review of mitigation occurs before any decision is made to seek death.  (*See* USJM 9-10.080, counsel for defense shall be given a reasonable opportunity to present information for consideration; 9-10.080(4), the analysis must identify applicable mitigation factors, and justify why aggravation factors outweigh mitigating factors in favor of death; 9-10.140(c), in employing the balance between aggravation and mitigation, ambiguities as to the presence or strength of aggravation or mitigation must be resolved in favor of the defendant.)

Here, in the midst of an unprecedented national crisis, which is underscored by uncertainty, and freezes the defense's ability to effectively represent Sergeant Carrillo, the government requests that the defense offer a date for a mitigation submission.  For all of the reasons set forth above, in this time of grave uncertainty, providing a date is

Notice

21

1   impossible.  That said, counsel for Sergeant Carrillo has invited discussion to explore

2   options that assuages the government's indicated concern about an "indefinite delay."

3   September 24, 2020, Carrillo Letter, Attachment A.

4          The government has also asked defense for "an indication of what [they] would

5   learn from [our] presentation if [they] were to push back the deadline." This request

6   invites potential error.  As *Andrus* makes clear- an uninformed presentation of mitigation

7   potentially becomes aggravation.  *Andrus,* 140 U.S. at 1883.

8          As was conveyed to the government, and noted earlier, all the defense knows at

9   this point is what the government already knows- Sergeant Carrillo has no criminal

10  history and has devoted his entire professional life to the service of our country.

11  Objectively speaking, this alone is a "red flag" that should alert us all to not rush this

12  process in the midst of a world wide pandemic.

13          **E.     Summation**

14          In the end, Sergeant Carrillo asks this Court to take notice of the fact that

15  notwithstanding reasonable diligence during the emergency, the national and statewide

16  COVID-19 emergency and responsive actions impedes the defense's ability to adequately

17  investigate and effectively prepare for trial.

18  **VI.    CASELAW REGARDING THE DEATH PENALTY DECISION
         SUBMISSION PROCESS**

19

20          Whether the Court has the jurisdiction to set a schedule for a defendant's death

21  penalty decision submission (see *United States v. Ryan Schlesinger*, United States District

22  Court for the District of Arizona, Case Number CR-18-02719-001-TUC-RCC (BGM),

23  Docket #91; and *United States v. Daniel Chavez and Victor Skates*, United States District

24  Court for the Northern District of California, Case Number 15-CR-00285-LHK, Dockets

25  #736, #848, and #886), or not (see e.g. *United States v. Patrick Crusius*, United States

26  District Court for the Western District of Texas, Case Number EP-20-CR-00389-DCG,

27  Docket #95; and *United States v. Eddy Urbina*, United States District Court for the

28  Northern District of California, Case Number 18-cr-000119-RS, Docket #132), the

Notice

1    rulings and some of the language of the orders is telling as to the deadline process.

2        **A.    Cases Finding Jurisdiction**

3            **1.    *United States v. Schlesinger***

4            In *Schlesinger*, the district court found "a distinction between the Court's authority

5    to enforce DOJ policy for presenting mitigation evidence (which the Government

6    challenges), and its authority to manage its docket (which the Government concedes is in

7    this Court's discretion)."  Order, *United States v. Ryan Schlesinger*, September 12, 2019,

8    Docket #91 at 2, Attachment B.  While, the court in *Schlesinger* was "not convinced it

9    has the inherent authority to enforce a DOJ policy" (id.), the court provided its thoughts

10   on the matter.

> For the United States Attorneys' Office to insist on a local presentation by
> the end of October would be unfair, unjust, and a vast waste of time and
> resources, especially when so many issues are still outstanding, including
> discovery and recusal motions.  The DOJ is clear: the purpose of the capital
> case review process is "to allow proper individualized consideration of the
> appropriate factors relevant to each case." DOJ Justice Manual § 9-10.030;
> *see James*, 2019 U.S. Dist. Lexis 57942, at *8 (If the DOJ's "Review
> Committee does not have a defendant's mitigation evidence, then it cannot
> consider all of the appropriate factors relevant to each case.").
> Furthermore, the Justice Manual provides that the Government "shall give
> counsel for the defendant a reasonable opportunity to present information
> for the consideration of the United States Attorney . . . which may bear on
> the decision whether to seek the death penalty.  *Id*. at § 9-10.080.

> The appropriate factors cannot be adequately considered when there is
> outstanding discovery and the possible recusal of local government
> counsel. Furthermore, the outstanding discovery prevents defendant from
> having a "reasonable opportunity to present" his mitigation evidence. The
> circumstances in this matter weigh against an expedited presentation. This
> Court believes that the schedule presented by the Defendant is a reasonable
> one that should be adopted by the local U.S. Attorney. In any event, the
> Court requires that it be notified of whether the Government's intends to
> seek the death penalty by July 1, 2020.  Id. at 2-3.

23           **2.    *United States v. Chavez and Skates***

24           In *Chavez*, District Court Judge Lucy Koh granted "Chavez's scheduling order

25   regarding the authorization presentation to the U.S. Attorneys' Office and set the

26   authorization presentation deadline for December 2, 2019.  ECF No. 724."[5]  Case

27   ────────────

28       [5]  As background to the portion of the Court's order that reads: "The Court
     GRANTED the motion to seal the declaration of James Thomson in support of the motion

Notice
                                      23

Management Order, *United States v. Daniel Chavez and Victor Skates*, June 5, 2019, Docket #736 at 2, Attachment C.

Later, the parties in *Chavez and Skates*, with trial set to commence July 9, 2021, noted in an April 8, 2020 (ECF 837) joint status report to the court, that "the defense set forth some of the difficulties stemming from the COVID-19 pandemic, which have prevented the defense from meeting with their clients, witnesses, and experts.[6] The government has faced similar difficulties that have significantly hampered its ability to provide additional materials requested by the defense, to prepare for the scheduled disclosures and motions, and prepare for trial.  For those reasons, in the April Joint Status Statement, the defense requested and the government agreed to delay certain deadlines in the Scheduling Order. The Court agreed and issued the Scheduling Order, which moved many of the most proximate deadlines by four to six months."  Stipulation and Order to Vacate Trial Date and Scheduling Order, June 9, 2020, Chavez Docket #848 at 2.

In June 2020, the parties in *Chavez* and *Skates* noted: "The difficulties previously described in the April Joint Status Statement remain ongoing, and it is not clear when relief from these difficulties will come.  The COVID-19 pandemic has truly changed the landscape of our world.  The parties also have concerns about greater difficulties in the Fall if, as medical experts have warned, there is an increase in the spread of COVID-19 when the weather cools, schools reopen, and many more people return to their traditional work environments."  Chavez Docket #848 at 2-3.  In response, the Court granted "the parties' request to vacate the 18th Amended Pre-Trial and Trial Scheduling Order (ECF 839) (the "Scheduling Order") in its entirety, and to continue the commencement of the

---

for a scheduling order regarding authorization presentation to the U.S. Attorneys' Office. ECF No. 735."  Chavez Doc #736 at 2, counsel advises this Court that Mr. Thomson represented Mr. Chavez from January 4, 2016 to March 7, 2018.  Chavez Docs #76 and #320.  Mr. Chavez is now represented by Richard Novak and other esteemed counsel.

[6] "As a result of the difficulties faced by the defense, defendant Chavez requested to continue the scheduled May 18, 2020 mitigation presentation to the Attorney General's Review Committee on Capital Cases. The government agreed to that request. No date for the mitigation presentation has been set at this time."  Chavez Doc #848 at 2.

1    trial from July 9, 2021, to May 2, 2022." Chavez Docket #848 at 5.

2        Even later, on August 24, 2020, the parties in *Chavez and Skates* noted: "The

3    COVID-19 pandemic has truly changed the landscape of our world. The parties also have

4    concerns about greater difficulties in the Fall if, as medical experts have warned, there is

5    an increase in the spread of COVID-19 when the weather cools, schools reopen, and

6    many more people return to their traditional work environments." Stipulation and

7    [Proposed] Order to Continue Status Conference, August 24, 2020, Chavez Docket #886

8    at 2-3. The Court "reviewed the above stipulation of the parties and grant[ed] the parties'

9    request to continue the September 16, 2020 status conference date to December 2, 2020,

10   at 9:15 a.m." Id. at 5.

11           **B.    Cases Not Finding Jurisdiction**

12                   **1.    *United States v. Crusius***

13       In *Crusius*, the defendant filed a "'Motion to Set Schedule Ensuring Patrick

14   Crusius Receives Effective Assistance of Counsel of Defense Counsel With Respect to

15   the Question of Whether the Death Penalty Should be Sought' (ECF No. 85), filed on July

16   11, 2020. Therein, Defendant asks the Court to vacate the Government's currently

17   scheduled pre-authorization mitigation presentation with defense counsel on July 30,

18   2020, and reset its scheduling until after the parties discuss a different date for it during

19   the scheduled October 7, 2020 status conference. Mot. at 1, 4, ECF No. 85." *United*

20   *States v. Crusius*. The Court denied the motion. Memorandum Opinion and Order, July

21   28, 2020, Docket #95 at 1.

22       In doing so, the district court "agree[d] that this capital case is exceptionally

23   voluminous and complex, and that postponing the July 30, 2020 mitigation presentation to

24   afford the defense team additional time to prepare a meaningful presentation because of

25   the COVID-19 pandemic would not be unreasonable." Memorandum Opinion and Order,

26   July 28, 2020, Docket #95 at 2-3. The court found: "Not surprisingly, as Defendant

27   painstakingly expounded in his June 15, 2020 'Status Report' (ECF No. 80) and the

28   instant motion, the COVID-19 pandemic, together with the ensuing national and state

Notice

1   emergency declarations, local stay-at-home orders, and the Center for Disease Control

2   ('CDC') Guidelines, have effectively crippled the defense counsel's mitigation

3   investigation." Id. at 4.  The court noted: "The importance of a meaningful mitigation

4   investigation for the pre-authorization mitigation presentation cannot be understated." Id.

5       The court explained at length:

6       Finding and interviewing witnesses who have known a capital defendant
        throughout his life is at the core of a mitigation investigation. The
7       American Bar Association's ('ABA') "Supplementary Guidelines for the
        Mitigation Function of Defense Teams in Death Penalty Cases" describes
8       the importance of in-person witnesses in the following way:

9           Team members must conduct in-person, face-to-face,
            one-on-one interviews with the client, the client's family, and
10          other witnesses who are familiar with the client's life, history,
            or family history or who would support a sentence less than
11          death. Multiple interviews will be necessary to establish trust,
            elicit sensitive information and conduct a thorough and reliable
12          life-history investigation. Team members must endeavor to
            establish the rapport with the client and witnesses that will be
13          necessary to provide the client with a defense in accordance
            with constitutional guarantees relevant to a capital sentencing
14          proceeding.

15      ABA, Mitigation Guideline 10.11(C), *Supplementary Guidelines for the
        Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra
16      L. Rev. 677, 689 (2008). In-person interviews are also necessary not only
        for obtaining a witness' mitigating testimony, but also any potential
17      mitigating physical evidence such as documents, photographs, or other
        records that a witness may possess. *See* Mitigation Guideline 10.4(A), *id.*
18      at 688 ('It is therefore incumbent upon the defense to interview all relevant
        persons and obtain all relevant records and documents that enable the
19      defense to develop and implement an effective defense strategy.'). Id. at 5.

20      But to date, the ensuing orders and CDC Guidelines still restrict nearly all
        non-essential travel and contact and interaction with other people in an
21      attempt to stop the spread of the virus—substantially limiting the defense
        team's ability to travel and conduct in-person interviews.  According to
22      Defendant, some defense team members and certain potential mitigation
        witnesses are especially at risk of infection because they fit into the
23      category of the population who is at high risk due to their age and existing
        medical conditions.  Since most potential witnesses are located here in
24      Texas, where deaths and hospitalizations continue to spike to this day,
        these witnesses will reasonably likely be afraid to welcome strangers
25      (particularly defense investigators) into their homes because of legitimate
        fears of COVID-19 transmission.  To make matters worse, contacting
26      potential witnesses solely though telephone would prove devastating to the
        defense team in trying to obtain any mitigating evidence from them.  *See*
27      *Eaton v. Wilson*, 09-CV-261-J, 2014 WL 6622512, at *73, *84 (D. Wyo.
        Nov. 20, 2014), *aff'd sub nom. Eaton v. Pacheco*, 931 F.3d 1009 (10th Cir.
28      2019) (describing the approach of contacting potential mitigation witnesses

Notice

1   solely via telephone in a capital case as "a textbook for how not to do it"
2   and concluding that the defense team "clearly did not adequately perform
    a thorough mitigation investigation."). As such, the Court agrees with
3   Defendant that attempting to conduct in-person interviews during these
    times would not only go against all ensuing federal and state orders and the
4   advice of the national public health authorities, but also risk damaging any
    possible relationship between his defense team and potential mitigation
5   witnesses. Id. at 5-6.

6       In ruling on the motion, the district court held: "That said, the Court nevertheless

7   lacks the authority to grant Defendant the relief he seeks because the pre-authorization

8   mitigation presentation is not a judicial proceeding presided over by a judge, but part of

9   an administrative, discretionary decision-making process of whether to seek the death

10  penalty. *United States v. Shakir*, 113 F. Supp. 2d 1182, 1188 (M.D. Tenn. 2000); *see also*

11  *United States v. Slone*, 969 F. Supp. 2d 830, 833 (E.D. Ky. 2013) (concluding that courts

12  lack the authority to schedule the defendant's presentation under the Death Penalty

13  Protocol); *United States v. Tsarnaev*, CRIM.A. 13-10200-GAO, 2013 WL 5701582, at *2

14  (D. Mass. Oct. 18, 2013) (same); *United States v. Hardrick*, CRIM.A. 10-202, 2011 WL

15  2516340, at *3 (E.D. La. June 22, 2011) (same)." Memorandum Opinion and Order, July

16  28, 2020, Docket #95 at 6. As such, the court denied the motion. Id. at 13.

17          **2.      *United States v. Urbina***

18      In *Urbina*, counsel moved the Court for an order setting a case management

19  schedule that would have allowed Mr. Urbina to prepare and present his case for life and

20  a motion for discovery to complete those tasks.[7] *United States v. Eddy Urbina*, Motion,

21  January 9, 2019, Docket #132. Mr. Urbina sought to extend the date set for the defense

22  presentation to the Committee since he had not been afforded the opportunity to present

23  to the local United States Attorney before appearing before the Committee. Id. at 5-6.

24      On March 1, 2019, District Court Judge Richard Seeborg ordered as follows: "As

25  to case management scheduling, it is certainly preferable for all concerned to develop a

26  full mitigation record for Committee review. That said, questions regarding the timing of

27

28          [7] Mr. Urbina is represented by Shaffy Moeel and James Thomson.

Notice
                                        27

1   Committee proceedings are internal to the Department of Justice.  Accordingly,

2   Defendant Urbina's motion is denied."  Doc #168, Attachment D.  Ultimately, the

3   government declined to seek death against Mr. Urbina.  Doc #200.  However, it did file a

4   notice of intent to seek death as to one co-defendant.  Doc #209.

5   **VII.   THE DEATH PENALTY DETERMINATION PROCESS CREATES**
    **CONSTITUTIONAL RIGHTS FOR DEFENDANTS.**

6

7          At least one court has held that the pre-authorization stage is a "critical" stage at

8   which the right to counsel attaches.  *United States v. Pena-Gonzalez*, 62 F.Supp.2d 358,

9   363–364 (D.P.R. 1999).  Furthermore, this District has previously held that "[t]he pre-

10  authorization phase of a potential capital case is analogous to the penalty phase of a trial,

11  and defense counsel must have access to all relevant discovery, in order to provide

12  effective assistance to Defendant."  *United States v. Ablett*, Case No. 09-cr-0749-RS (JL),

13  Discovery Order at 1, Ablett Doc #73.

14         The basis for these holdings rests on the fact that the government's discretion is

15  not unfettered, and is subject to constitutional constraints.  *See, e.g.*, *McCleskey v. Kemp*,

16  481 U.S. 279, 297 (1987) (acknowledging that prosecutorial discretion is subject to

17  review for abuse).  Moreover, "[p]rocedural due process imposes constraints on

18  governmental decisions which deprive individuals of 'liberty' or 'property' interests

19  within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."

20  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  Of course, the due process clause also

21  encompasses an individual's interest in his "life."

22         "The fundamental requirement of due process is the opportunity to be heard at a

23  meaningful time and in a meaningful manner."  *Mathews*, 424 U.S. at 333 (quotation

24  omitted).  "'(D)ue process is flexible and calls for such procedural protections as the

25  particular situation demands.'  Accordingly, resolution of the issue whether the

26  administrative procedures provided here are constitutionally sufficient requires analysis of

27  the governmental and private interests that are affected."  *Id.* at 334 (quoting *Morrissey v.*

28  *Brewer*, 408 U.S. 471, 481 (1972)).

Notice

1    By extending a role to the defense in the government's life-or-death decision

2  making at the pre-authorization stage, the government has surely triggered due process

3  protections.  Given the magnitude of the private interest affected—Sergeant Carrillo's

4  very life—due process requires that the government allow him to meaningfully participate

5  in authorization process.

6  **VIII.  CONCLUSION**

7    For the foregoing reasons, counsel provides notice that they are unable to

8  constitutionally present Sergeant Carrillo's death penalty decision submission by the

9  unreasonable deadline arbitrarily imposed by the government and are unable to accurately

10  estimate then they can present the submission.

11

12  DATED: September 25, 2020                  Respectfully submitted,

13                                             */s/ James Thomson*

14                                             _____
                                               JAMES THOMSON
                                               Attorney for Steven Carrillo
15
                                               */s/ Kathryn Ross*
16
                                               _____
17                                             KATHRYN ROSS
                                               Attorney for Steven Carrillo

18

19

20

21

22

23

24

25

26

27

28