JAMES S. THOMSON
California SBN 79658
Attorney and Counselor at Law
732 Addison Street, Suite A
Berkeley, California 94710
Telephone: (510) 525-9123
Facsimile:  (510) 525-9124
Email: james@ycbtal.net

KATHRYN ROSS
California SBN 171100
Attorney at Law
1611 Telegraph Avenue, Suite 806
Oakland, California 94612
Telephone: (415) 297-1262
Email: katie@kathrynrosslaw.com

Attorneys for Defendant
STEVEN CARRILLO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 4:20-cr-00265-YGR |
| Plaintiff, | **SERGEANT STEVEN CARRILLO'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS NOTICE OF COUNSELS' INABILITY TO CONSTITUTIONALLY PRESENT HIS DEATH PENALTY DECISION SUBMISSION BY THE UNREASONABLE DEADLINE ARBITRARILY IMPOSED BY THE GOVERNMENT AND INABILITY TO ACCURATELY ESTIMATE WHEN THEY CAN PRESENT THE SUBMISSION** |
| vs. | |
| STEVEN CARRILLO, | |
| Defendants. | **Date: October 28, 2020**<br>**Time: 2:00 P.M.** |
| | Judge: Hon. Yvonne Gonzalez Rogers |

**TABLE OF CONTENTS**

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. SERGEANT CARRILLO'S INVITATION TO MEET AND CONFER
TO ADDRESS THE GOVERNMENT'S CONCERNS ABOUT AN
"INDEFINITE DELAY" RECEIVED NO REPLY. . . . . . . . . . . . . . . . . . . . . . . . . 2

III. THE PURPOSE OF SERGEANT CARRILLO'S NOTICE. . . . . . . . . . . . . . . . . 3

IV. THE GOVERNMENT'S PROPOSED TIMEFRAME IS OBJECTIVELY
UNREASONABLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A. Restrictions Necessitated by the COVID-19 Pandemic Undermine the
       Requirements for Effective Capital Defense Practice. . . . . . . . . . . . . . . . . 6

    B. The Government Inaccurately Asserts that Sergeant Carrillo Equates
       the Local Mitigation Presentation with Trial. . . . . . . . . . . . . . . . . . . . . . . . 8

    C. The Government Appears to be Guided Only by the Facts of the Case. . . . 9

V. THE COVID PANDEMIC IS REAL; IT IS DEADLY;
AND IT IS NOT OVER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI. SERGEANT CARRILLO'S REPLY TO THE GOVERNMENT'S
OPPOSITION TO HIS NOTICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A. Reply to the Government's Preliminary Statement. . . . . . . . . . . . . . . . . . . 13

    B. Reply to the Government's Procedural History. . . . . . . . . . . . . . . . . . . . . . 15

    C. Reply to the Government's Claim that the United States Death
       Penalty Process Timing is Reasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        1. The Government's Case Comparisons are Inapt. . . . . . . . . . . . . . . 18

        2. Defense Counsel in *Tsarnaev*, *Roof*, and *Bowers* had
           More Time to Prepare. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        3. *Tsarnaev*, *Roof*, and *Bowers* are Distinguishable. . . . . . . . . . . . . 21

        4. Summation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    D. Reply to the Government's Specific Arguments
       Raised in the Opposition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    E. Reply to the Government's Claim that the Court Should Not
       Intervene into the Death Penalty Process Timeframe. . . . . . . . . . . . . . . . . 32

VII. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

i

1

**TABLE OF AUTHORITIES**

2

3

**FEDERAL CASES**

4   *Andrus v. Texas,* 590 U.S.__, 140 S.Ct. 1875 (2020). . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 30

5   *Kimmelman v. Morrison,* 477 U.S. 365 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 33

6   *Porter v. McCollum,* 558 U.S. 30 (2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

7   *Strickland v. Washington,* 466 U.S. 668 (1984).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 33

8   *United States v. Gomez-Olmeda,* 296 F. Supp. 2d 71 (D.P.R. 2003).  . . . . . . . . . . . . . . 33

9   *United States v. Pena-Gonzalez,* 62 F. Supp. 2d 358 (D.P.R. 1999). . . . . . . . . . . . . . . . 33

10  *United States v. Tsarnaev,* 968 F.3d 24 (1st Cir. 2020).. . . . . . . . . . . . . . . . . . . . . .  passim

11  *Wiggins v Smith,* 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

12  *Williams v. Taylor,* 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

13  *Woodson v. North Carolina,* 428 U.S. 280 (1976.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF ATTACHMENTS**

Attachment A      Sergeant Carrillo Letter (September 24, 2020)

Attachment B      Order, *United States v. Ryan Schlesinger* (September 12, 2019)

Attachment C      Case Management Order, *United States v. Daniel Chavez and Victor Skates* (June 5, 2019)

Attachment D      Order, United States v. Eddy Urbina (March 1, 2019)

Attachment E      Liz Vartkessian Declaration (September 28, 2020)

Attachment F      Liz Vartkessian Declaration (May 27, 2020)

Attachment G      Liz Vartkessian Vitae

Attachment H      President Trump COVID Tweet (October 1, 2020)

Attachment I       Christie Reveals He Spent 7 Days in ICU and Admits He Was "Wrong" to Not Wear a Mask, CNN (October 16, 2020)

Attachment J      What's Coming This Winter? Here's How Many More Could Die In The Pandemic, National Public Radio (October 16, 2020)

Attachment K      US Coronavirus Cases Are Probably 10 Times Higher than the Official Numbers, More and More Research Suggests, Business Insider (July 25, 2020)

Attachment L      Joint Status Report of the Parties, *United States v. Earnest* (October 14, 2020)

Attachment M      Hearing Transcript, *United States v. Urbina* (February 28, 2019)

Attachment N      Counsel Email to Courtroom Deputy (August 19, 2020)

JAMES S. THOMSON
California SBN 79658
Attorney and Counselor at Law
732 Addison Street, Suite A
Berkeley, California 94710
Telephone: (510) 525-9123
Facsimile:  (510) 525-9124
Email: james@ycbtal.net

KATHRYN ROSS
California SBN 171100
Attorney at Law
1611 Telegraph Avenue, Suite 806
Oakland, California 94612
Telephone: (415) 297-1262
Email: katie@kathrynrosslaw.com

Attorneys for Defendant
STEVEN CARRILLO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>STEVEN CARRILLO,<br><br>Defendants.<br>_____ | Case No. 4:20-cr-00265-YGR<br><br>**SERGEANT STEVEN CARRILLO'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS NOTICE OF COUNSELS' INABILITY TO CONSTITUTIONALLY PRESENT HIS DEATH PENALTY DECISION SUBMISSION BY THE UNREASONABLE DEADLINE ARBITRARILY IMPOSED BY THE GOVERNMENT AND INABILITY TO ACCURATELY ESTIMATE WHEN THEY CAN PRESENT THE SUBMISSION**<br><br>**Date: October 28, 2020**<br>**Time: 2:00 P.M.**<br><br>Judge: Hon. Yvonne Gonzalez Rogers |

## I.      INTRODUCTION

The government's opposition to Sergeant Steven Carrillo's notice of inability to present a death penalty decision submission by any unreasonable deadline is an exercise in dismissiveness.  It dismisses the constitutional standards that govern capital defense and the rules of professional responsibility that control effective representation.  It dismisses the attempts made by the Carrillo team to work with it in this unprecedented time.  It dismisses its own obligation to conduct the balanced analysis of mitigation needed to make this life-and-death decision.  It dismisses the fact that Sergeant Carrillo did not make an ask of this Court, but rather sought to keep this Court appraised of the defense status in light of the motion by Robert Justus.  And, it is entirely dismissive of the disabling impact of the Coronavirus Disease (COVID-19) global pandemic on a capital defense counsel's ability to effectively represent a client.

The government's opposition has misrepresented Sergeant Carrillo's position in its claim that counsel has demanded "trial readiness" before making the mitigation presentation.  In doing so, the government demonstrates that it has either ignored, or has not fully digested, the rules and laws that govern a mitigation analysis.  Indeed, the government's position that the "swift" production of discovery provides the basis for a "swift" mitigation presentation, raises the question of whether the government understands the difference between a mitigation investigation and a fact investigation.

Ultimately, the government's opposition conveys that its analysis begins and ends with the facts of this case, notwithstanding the fact that the person it seeks to execute has no criminal history and has devoted his entire professional life in service of our country.

## II.      SERGEANT CARRILLO'S INVITATION TO MEET AND CONFER TO ADDRESS THE GOVERNMENT'S CONCERNS ABOUT AN "INDEFINITE DELAY" RECEIVED NO REPLY.

The government offers an inaccurate description of the "meet and confer"process. In doing so, the government mischaracterizes Sergeant Carrillo as having demanded an "indefinite" delay.  ("Carrillo does not ask for any relief but instead purports to provide "notice" of his counsel's 'inability to constitutionally represent' him without *indefinite*

delay." Doc #39 at 9, emphasis added. "For all the challenges created by the shelter restrictions it cannot be that the only reasonable approach is *indefinite* delay. In fact, by insisting of anything short of *indefinite* delay violates the 'reasonable opportunity' provision of the Justice Manual, JM9-10.080, defendant[] argue[s] in essence for the United States to violate another provision of the Justice Manual." Id. at 8, emphasis added. "Carrillo takes the position that any course other than *indefinite* delay 'invites potential' error.)" Id. at 14, emphasis added.

Before the briefing began, Sergeant Carrillo's defense team wrote to the government seeking to meet and confer to resolve the issue of the local mitigation presentation short of litigation. September 24, 2020 Carrillo letter, at Doc #37, Notice, Attachment A. In that letter, Sergeant Carrillo specifically sought to address the government's concern about an "indefinite" delay. "While it is true that we cannot provide you with a date in a vacuum given this unprecedented and uncertain time, we wanted to discuss ideas about how we might move forward in a way that assuages your concern about an 'indefinite' timeline." Id.

The hope was to meet and find a balance between the government's need to provide the Capital Case Review Committee (CCRC) with a recommendation and with Sergeant's Carrillo's right to effective representation and his right to make an informed presentation. This invitation did not receive the courtesy of a response.

**III.    THE PURPOSE OF SERGEANT CARRILLO'S NOTICE**

Sergeant Carrillo wants to be clear as to his position concerning the current round of litigation. He did not file a motion. He did not ask the Court to grant relief or issue an order. He only asked the Court to take notice of the current and on-going deadly world-wide COVID-19 pandemic. "In the end, Sergeant Carrillo asks this Court to take notice of the fact that notwithstanding reasonable diligence during the emergency, the national and statewide COVID-19 emergency and responsive actions impedes the defense's ability to adequately investigate and effectively prepare for trial." Doc #37 at 22.

Sergeant Carrillo filed a notice of his counsels' inability to constitutionally present his death penalty decision submission by the unreasonable deadline arbitrarily imposed by the government and inability to accurately estimate when they can present the submission. Doc #37.  The purpose was to merely inform the Court and the parties that he did not have the present ability to investigate, prepare, and present a Death Penalty Decision Submission (submission) in the time frame set by the government.  He advised that he believed he was still in the process of meeting and conferring with the government regarding the setting of a submission schedule.

Sergeant Carrillo notified the Court and parties that he only filed the notice because Mr. Justus had decided to file a motion to compel the United States Attorney to give counsel for the defendant a reasonable opportunity to present information that may bear on the decision whether to seek the death penalty.  Doc #37 at 2.  A motion that Sergeant Carrillo has not joined.  He filed the notice[1] solely to advise the Court of his situation *vis-à-vis* Mr. Justus's motion.

Perhaps calling the pleading a notice created some of the confusion in the government's pleading, which mixes Sergeant Carrillo's position with Mr. Justus's argument.  The two are quite different.  Mr. Justus is asking the Court to act; Sergeant Carrillo is not.  But, by filing a singular opposition incorporating Sergeant Carrillo's and Mr. Justus's positions, the government has mixed the distinct messages.

---

[1]  The government appears to take umbrage with the fact that Sergeant Carrillo filed the notice at all, or that it was somehow mistitled.  Indeed, the government asks the Court to "provide direction to Carrillo about the filing of 'notice' pleadings that do not move for relief but instead may create a false impression of error."  Doc #39 at 6. Counsel for Sergeant Carrillo apologize for any confusion that might have been generated by the title of the pleading.  If the government or the Court would have counsel amend the title to read: "Status Report Regarding the Inability to Constitutionally Present His Death Penalty Decision Submission by the Unreasonable Deadline Arbitrarily Imposed by the Government and Inability to Accurately Estimate When They Can Present the Submission," counsel will promptly do so by filing an errata.

4

1    In an effort to unravel the opposition, Sergeant Carrillo addresses those portions of

2    the opposition that apply to him alone.

3    However, before doing so, Sergeant Carrillo stresses that a death penalty decision

4    submission requires a comprehensive investigation into his social history.  The magnitude

5    of the tasks counsel must undertake is quite comprehensive.  See American Bar

6    Association Guidelines for the Appointment and Performance of Defense Counsel in

7    Death Penalty Cases (Revised Edition, February 2003).  Importantly, counsel must

8    investigate the case before acting in a way that could jeopardize their client.  *Strickland v.*

9    *Washington*, 466 U.S. 668, 690–91 (1984); *Kimmelman v. Morrison*, 477 U.S. 365, 384

10   (1986).

11   On the other hand, the local United States Attorney is not under any mandate to

12   submit its local recommendation to the Department of Justice (DOJ) by a precise date.

13   The United States Justice Manual (USJM) does not impose a deadline for the local

14   submission.  See USJM Section 9-10.000 - Capital Crimes.  Rather, the USJM provides

15   that "[t]he overriding goal of the review process is to allow proper individualized

16   consideration of the appropriate factors relevant to each case."  Section 9-10.030.

17   "Fairness requires all reviewers to evaluate each case on its own merits and on its own

18   terms."  Section 9-10.140.  This is why the USJM provides that "the United States

19   Attorney or Assistant Attorney General shall give counsel for the defendant a reasonable

20   opportunity to present information . . . which may bear on the decision whether to seek

21   the death penalty."  USJM section 9-10.080.

22   Under these circumstances, asking Sergeant Carrillo to accelerate his life or death

23   presentation, in such a short time is simply wrong.  For all of the reasons set out in the

24   notice and this reply, counsel simply cannot effectively accomplish these tasks by the

25   government's imposed deadline.   Indeed, a self-imposed deadline.

26

27

28

**IV.   THE GOVERNMENT'S PROPOSED TIMEFRAME IS OBJECTIVELY UNREASONABLE.**

    **A.   Restrictions Necessitated by the COVID-19 Pandemic Undermine the Requirements for Effective Capital Defense Practice.**

Sergeant Carrillo gave notice to this Court and the government of the rules that govern an effective capital defense practice.  These rules reflect the universal recognition that "death is different."  See *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976.)

Despite the unique space death penalty prosecutions occupy in the criminal justice landscape, in opposition, the government argues that capital defense attorneys should make due, as others have, during this global pandemic:

> Defendants argue that the coronavirus changes everything, but at this point in the pandemic, in nearly all segments in life, people have found ways to safely carry forward. Courts and lawyers have changed the way they work, but they have not simply stopped working, nor should they. The criminal justice system must continue to function through the present challenges. Doc #39 at 10.

Nowhere does the government directly address the special rules that govern capital defense.  Instead, the government argues: "the interference caused by shelter restrictions is not as extensive as defendants claim, particularly at this point in the pandemic when practices like social distancing and mask wearing have allowed many activities, essential and otherwise, to carry on safely."  Doc #39 at 11.

Ignoring the legal authority presented, the government falsely accuses the defense of offering no support for the described impediments to the mitigation investigation (Doc #39 at 14) and berates the defense for being "hyperbolic" about the impact of the global pandemic.  Doc #39 at 12.

This position ignores the American Bar Association Guidelines (provided to the government by Sergeant Carrillo's defense team and recognized by the Supreme Court as the standard for effective representation in a capital case), which require in-person mitigation investigation (2008 ABA Supplemental Guidelines Rule 10.11 (B)&(C)) and which mandate frequent contact visits with clients.  (ABA Guideline 10.5, "[C]ounsel at all stages of the case should make every appropriate effort to establish a relationship of

trust with a client and should maintain close contact with the client.").  As previously
noted (Doc #37 at 24), commentary surrounding these standards make clear that the
barriers imposed by the pandemic dramatically limit the intimate and sensitive nature of
mitigation work:

> [T]he vast majority of the men and women who are charged with or
> convicted of capital crimes have backgrounds of violence, abuse, and
> neglect. As an essential part of any capital case investigation, families that
> have carefully hidden shameful secrets of incest, abuse, alcoholism, and
> mental illness for generations must now be persuaded to disclose these
> details. It is a difficult and intimidating process. These are not secrets that
> will be revealed to strangers on the first visit, or even perhaps the third or
> fourth. Yet the damaging and destructive nature of these secrets is the very
> evidence that might convince a jury to spare a client's life.

Robin M. Maher, The ABA and the Supplementary Guidelines for the Mitigation
Function of Defense Teams in Death Penalty Cases, 36 Hofstra Law Review 763, 771.

Sergeant Carrillo's defense team does not seek to "dictate the course of this case."
Doc #39 at 6.  Rather, the Carrillo defense team seeks to defend him in accordance with
the well-established rules that govern effective representation, especially in the time of
the pandemic.

For example, Elizabeth Vartkessian, Ph.D, a mitigation specialist, private detective
and private investigator in multiple jurisdictions prepared two detailed declarations
addressing "the impacts that the COVID-19 pandemic has had on the ability of capital
defense teams to engage in mitigation investigation in keeping with the applicable
professional standards."  Elizabeth Vartkessian September 28, 2020 Declaration,
Attachment E.  See also Elizabeth Vartkessian May 27, 2020 Declaration, Attachment F,
and Elizabeth Vartkessian Vitae, Attachment G.  Mr. Vartkessian wrote, in part:

> In order for mitigation evidence to be obtained, a potential witness needs
> to be in the right frame of mind to discuss difficult experiences and
> memories. Given the communities from which most capital defendants
> come, witnesses are at a greater likelihood of having contracted the virus
> at some point or having had a close family member contract the virus. They
> may be experiencing significant disruption in their schedules, financial
> well-being, and mental health due to job loss (permanent or temporary),
> school closures, or closures of other community services. All of these
> factors may increase the perceived violation of an interview attempt under
> pandemic conditions and result in even more significant barriers to a return
> attempt by the mitigation specialist. In some cases, due to more family

members being at home due to lack of employment, at-home schooling, or simply limited options to go elsewhere, it may be impossible to conduct an interview with adequate privacy even if the mitigation specialist is admitted into the home.

The longevity of the pandemic is creating obstacles even in some previously established witness relationships. A client family member, for example, who has previously been open and engaged in the interview process may, after the strain of the past several months, have less capacity for or interest in continuing even casual contact with a mitigation specialist. Pushing such witnesses would only alienate the witness and damage existing rapport. As a result, once interviewing can resume, mitigation specialists may often find themselves in the position of having to carefully rebuild relationships rather than picking up where they left off.

Elizabeth Vartkessian September 28, 2020 Declaration at 14, ¶¶38 and 39.  Attachment E.

**B.    The Government Inaccurately Asserts that Sergeant Carrillo Equates the Local Mitigation Presentation with Trial.**

The government claims that "defendants argue that they must complete their factual investigation before they can make a local mitigation presentation." Doc #39 at 11.  Sergeant Carrillo has made no such argument.  The government further asserts that "Carrillo claims that all the standards governing what it means to properly defend a capital case at trial 'apply at the decision submission stage', yet he cites no authority for that extraordinary proposition."  Doc #39 at 11.  Not so.

The government misinterprets both the law and Sergeant Carrillo's position.  The notice endeavored to lay out the legal and ethical standards that govern an effective capital defense practice.  In doing so, Sergeant Carrillo provided ample authority for the proposition that the defense must conduct a thorough and accurate mitigation investigation in order to effectively represent their client.  Doc #37 at 16-17; citing *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v Smith*, 539 U.S. 510 (2003), *Porter v. McCollum*, 558 U.S. 30 (2009).  *See also* 2003 ABA Guidelines and 2008 ABA Supplementary Guidelines cited at Doc #37 at 17-20.

Sergeant Carrillo cited the recent Supreme Court *per curiam* decision in *Andrus v. Texas*, 590 U.S.__, 140 S.Ct. 1875 (2020), because it supports the inherently logical premise that presenting inaccurate information to an adversary, *at any time*, is both

foolish and ineffective. *Andrus* illustrates the danger of mitigation evidence falling prey to erroneous conclusions if it is not thorough and accurate. In reversing a death verdict, the Supreme Court cautioned that presenting incomplete mitigation can backfire on a defense case: "No doubt due to counsel's failure to investigate the case in mitigation, much of the so-called mitigating evidence he offered unwittingly aided the State's case in aggravation." *Id*. at 1883.

Sergeant Carrillo does not equate a local mitigation presentation with trial readiness as claimed by the government. Doc #39 at 14. Sergeant Carrillo rightfully sees potential inaccuracy as potentially ineffective. The government's timeframe for a local mitigation presentation renders it impossible to guarantee the accuracy of the mitigation evidence that would be presented.

**C.    The Government Appears to be Guided Only by the Facts of the Case.**

The government's opposition leaves the impression that its recommendation will rest with the facts of the prosecution case. To justify its proposed timeline, the government focuses on the case facts as it sees it.

> The case is not overly complicated by the standards of capital prosecutions, and it has been prosecuted in a way that should speed up the work of the defense. The heart of the case is a single criminal episode occurring on May 29, 2020. The United States filed detailed complaints, prioritized the production of discovery, and provided reverse proffers. Doc #39 at 10.

The government stresses that the nature of the discovery and the speed of its production should allow for a speedy local mitigation presentation. ("But many key items of discovery were produced months ago (cite) and the overall volume of discovery in this case is not especially large by the standards of federal litigation." Doc #39 at 10.) This view echoes the sentiment addressed in its July 30, 2020 letter to Sergeant Carrillo's defense team where the government relayed an ability to conduct an analysis of the case because of the United States Attorney's immediate involvement with the investigation on the night of the shooting. There, the United States Attorney explained, "I have been briefed on this particular case since the night of the charged murder and attempted murder on May 29, 2020, and therefore have the advantage of already being well grounded in the

1  facts of the case.  Whether or not you choose to present to me (and again, my request is

2  that you do present to me), I do not expect to need more than 3 months to form my

3  opinion."  Government's July 30, 2020 Letter to Defense Counsel.

4       Notably absent from the government's position is even a reference to the

5  comprehensive investigation into Sergeant Carrillo's social history, medical history and

6  military history required for the mitigation investigation.  Nor does the government

7  acknowledge the inherently delicate and sensitive nature of a mitigation investigation.

8  Instead, the government references "trial investigation" and "fact investigation."  Doc #39

9  at 7, 14.   As noted, the government even mistakenly believes that Sergeant Carrillo's

10  defense team seeks to complete their "factual investigation" before making a local

11  mitigation presentation.  Doc #39 at 7.

12       The government's tunnel-visoned focus on the facts of the case appears to run

13  afoul of it's own Justice Manual's "Standards for Determination", which require a

14  probing analysis of mitigation, where all ambiguities "as to the presence or strength of

15  aggravating or mitigating factors" are to be resolved in favor of the defendant.  The

16  weighing of the factors must be "qualitative, not quantitative."  USJM 9-10.140(C).

17       Sergeant Carrillo's defense team welcomes the opportunity to present to the

18  government in a manner that comports with it's own standards.

19  **V.    THE COVID PANDEMIC IS REAL; IT IS DEADLY; AND IT IS NOT
       OVER.**

20

21       Initially identified in December 2019 in Wuhan, China, the COVID-19 outbreak

22  was declared a Public Health Emergency in January 2020 by the World Health

23  Organization (WHO).

24       In February 2020, travel restrictions to and from China were enforced by the

25  United States.  Americans returning from countries with high infection rates were

26  subjected to health screenings and a 14-day quarantine.  The earliest confirmed

27  COVID-19 death in the United States occurred on February 6, 2020 in Santa Clara

28

County, California.  However, the Centers for Disease Control and Prevention (CDC) did not report this confirmation until April 21, 2020.[2]

On March 11, 2020, the WHO formally recognized COVID-19 as a pandemic.  By that time, the virus had already spread to 110 countries and all continents except Antarctica.[3]

That same day, Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, testified that the mortality rate from COVID-19 is 10 times that of the seasonal flu.[4]

Beginning in March 2020, many state governors implemented a "stay at home" order through their respective states.  Businesses were forced to temporarily close or reduce hours.  Staff were laid off in many instances.  Schools were shut down, and students and instructors had to adapt to remote learning and teaching.

On March 12, 2020, confirmed COVID-19 cases exceeded 1,000 in the United States.  By March 27, 2020, the United States had over 100,000 cases.

By late May 2020, 100,000 Americans had died from COVID-19.

By June 11, 2020, the United States surpassed two million COVID-19 cases.  On July 17, the United States saw a record of, at the time, the highest single-day infection

---

[2] Coronavirus Death in California Came Weeks Before First Known U.S. Death, New York Times (https://www.nytimes.com/2020/04/22/us/coronavirus-first-united-states- death.html) (last visited October 17, 2020).

[3] Coronavirus Has Become a Pandemic, W.H.O. Says, New York Times (https://www.nytimes.com/2020/03/11/health/coronavirus-pandemic-who.html) (last visited October 17, 2020); Coronavirus has now spread to every continent except Antarctica, CNN (https://www.cnn.com/asia/live-news/coronavirus-outbreak-02-26-20-intl-hnk/h_cae39a08e358777f9cd1409c561b8c19) (last visited October 17, 2020).

[4] Top US health official says the coronavirus is 10 times 'more lethal' than the seasonal flu, CNBC (https://www.cnbc.com/2020/03/11/top-federal-health-official-says-coronavirus-outbreak-is-going-to-get-worse-in-the-us.html) (last visited October 17, 2020).

number anywhere in the world of 77,638.  Twelve days later, on July 29, 150,000 Americans had died from COVID-19.

By August 31, 2020, the United States surpassed six million cases.[5]

By September 22, 2020, over 200,000 Americans had died from COVID-19. Three days later on September 25, the United States passed seven million cases.[6]

In early October, a substantial number of national political figures and staffers were infected with COVID-19.  On October 1, President Donald Trump tweeted that he and the First Lady, Melania Trump, tested positive for COVID-19.  Attachment H.

On October 3, 2020, former New Jersey Governor Chris Christie announced that he had tested positive.  He spent seven days in the Intensive Care Unit battling the disease.  In a recent interview, Governor Christie stated that it was a mistake to not have worn a mask during a White House event.  He urged everyone to wear a face covering: "I let my guard down for a couple of days inside the White House grounds and it cost me in a significant way."  Christie Reveals He Spent 7 Days in ICU and Admits He Was 'Wrong' to Not War a Mask, CNN (October 16, 2020), Attachment I.

As of October 18, 2020, there were approximately 40,148,259 reported cases of COVID-19 and 1,116,884 recorded deaths worldwide.[7]  In the United States alone, reported cases stand at 8,352,652 and reported deaths at 224,393.[8]  The United States is

---

[5] John Hopkins Coronavirus Resource Center, reported by BBC (https://www.bbc.com/news/world-53976793#:~:text=The%20US%20has%20now%20surpassed,183%2C000%20people %20have%20now%20died) (last visited October 17, 2020).

[6] John Hopkins Coronavirus Resource Center, reported by NPR (https:// www.npr.org/sections/coronavirus-live-updates/2020/09/22/911934489/enormous-and-tragic- u-s-has-lost-more-than-200-000-people-to-covid-19) (last visited October 17, 2020).

[7] https://www.worldometers.info/coronavirus/ (last visited October 18, 2020).

[8] https://www.worldometers.info/coronavirus/country/us/ (last visited October 18, 2020).

1   averaging more than 52,000 new cases a day.  What's Coming This Winter? Here's How

2   Many More Could Die In The Pandemic, National Public Radio (October 16, 2020),

3   Attachment J.  A very recent (yesterday) story noted:

> Twenty-seven states saw spikes between 10% and 50%: Alabama, Arizona,
> Colorado, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Massachusetts,
> Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Jersey, New
> Mexico, North Dakota, Ohio, Rhode Island, South Carolina, South Dakota,
> Texas, Washington, West Virginia, Wisconsin and Wyoming.
>
> On Friday, 10 states reported their highest one-day counts: Colorado,
> Idaho, Indiana, Minnesota, New Mexico, North Carolina, North Dakota,
> West Virginia, Wisconsin and Wyoming, according to Johns Hopkins.

9   As Coronavirus Surges Across the US, Only 2 States Are Trending in the Right Direction,

10  Madeline Holcombe, CNN, Updated 9:46 AM ET, Sun October 18, 2020.

11      Importantly, a CDC study indicates that the true number of coronavirus cases may

12  be more than 10 times higher than official tallies in many parts of the United States.  Dr.

13  Howard Koh of Harvard T.H. Chan School of Public Health states that the issue at hand

14  is how much are cases and deaths undercounted, and that "we probably won't know the

15  real number of deaths and numbers infected until this is all over."  US Coronavirus Cases

16  Are Probably 10 Times Higher than the Official Numbers, More and More Research

17  Suggests, Business Insider (July 25, 2020), Attachment K.

18      And, the truth be known, there is no end in sight.  The COVID-19 outbreak

19  remains a national public health emergency with millions falling to the disease and

20  thousands upon thousands of lives lost.  The disruption of daily existence is manifest.  As

21  Dr. Fauci and others have warned, the pandemic will only worsen as the flu season

22  approaches.

## VI.   SERGEANT CARRILLO'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS NOTICE

### A.   Reply to the Government's Preliminary Statement

26      The government claims that "the United States has given defendants a reasonable

27  opportunity to make a local mitigation presentation."  Doc #39 at 5.  Not so.

1    The government argues that "[f]ollowing each of the 2013 Boston Marathon

2  bombing, the 2015 Charleston church shooting, and the 2018 Pittsburgh synagogue

3  shooting, the entire DPP was completed and the Attorney General's death-penalty

4  determination was made within ten months of charging."  Doc #39 at 5.  As to this case,

5  the government "seeks to resolve the local DPP process, which is just the first step of the

6  DPP, in five months."  Id.  This timeframe is unprecedented.

7    The government claims that "the defense takes the position that no part of the DPP

8  can move forward while we shelter in place," and then warns "no one in our courthouse

9  community is entitled to 'freeze' their work, Dkt. 37 at 25, not even defense counsel in a

10  capital case."  Doc #39 at 5.  Sergeant Carrillo's counsel never said they could not work

11  on this, or any of the other cases they handle in their practice.  Indeed, counsel have

12  gotten "their work done by phone, by Zoom, or in person with appropriate precautions"

13  (id.) in routine matters.

14    Sergeant Carrillo has not taken "the position that even the first step in the DPP

15  cannot be completed until after shelter restrictions are lifted."  Doc #39 at 5.  What

16  counsel has made clear is that given the complexity of the case and the adverse effect of

17  the COVID-19 pandemic, they cannot complete the work required for a meaningful

18  submission within the arbitrary timeline imposed by the government.

19    Once again by improperly grouping Mr. Justus and Sergeant Carrillo, the

20  government claims: "Defendants demand an order delaying the DPP indefinitely."  Doc

21  #39 at 6.  Sergeant Carrillo made no such demand.

22    The government claims that the thrust of the defendants' motion and notice "are

23  pure boilerplate.  *See, e.g.*, Dkt. 38 at 70, 89 (declarations signed in April 2020

24  emphasizing the uncertainty in April 2020 that courthouses would open and lawyers

25  would be able to do their work)."  Doc #39 at 6.  The government misses the mark.[9]

26

27        [9]The government's citation is to Mr. Justus's motion, yet Sergeant Carrillo is
28  grouped into the assertion.

1    Without noting the specific "false impression[s] or error," the government requests

2  the Court to "provide direction to Carrillo about the filing of "notice" pleadings that do

3  not move for relief but instead may create a false impression of error. *Cf.* Dkt. 28

4  (Carrillo's "status report" expressing unresolved misgivings about Zoom), 33 (Carrillo's

5  "status report" containing a partial recitation of the parties' meet and confer on the

6  present motion practice)." Doc #39 at 6.  Without mentioning where, the government

7  claims that "[a]spects of Carrillo's filings seem to test defense power to dictate the course

8  of this case." Id.

9    Counsel assure the Court that they are not trying to dictate anything.  Counsel

10  simply provided notice of their inability to meet the government's arbitrary and

11  unreasonable timeline for the filing of the submission.  Sergeant Carrillo has no argument

12  with the proposition that "it is for the United States to prosecute and for this Court to

13  preside." Doc #39 at 6.  Counsel understand their role in the process.  They are to make

14  sure that their clients' rights are protected; that they are led by the guiding hand of

15  counsel; and that their representation be zealous and effective under the Sixth

16  Amendment.

17  **B.    Reply to the Government's Procedural History**

18    The government claims:

19  Carrillo says that his counsel was appointed on July 8, 2020. Dkt. 37 at 14.
20  This Court's appointment order was entered that day, but Carrillo's counsel
    had appeared on July 2, 2020, and had been appointed *nunc pro tunc* to
    June 27, 2020. Dkt. 18. Carrillo appeared on June 23, 2020, Dkt. 6, and his
21  counsel was appointed effective to June 27, 2020, Dkt. 8.'  Doc #39 at 7,
    FN 2.
22

23  To be clear, counsel for Sergeant Carrillo wrote that on July 2, 2020, the Magistrate Court

24  appointed James Thomson as counsel and that on July 8, 2020, "this Court (the District

25  Court) appointed Mr. Thomson as lead and learned counsel for Sergeant Carrillo."  Doc

26  #37 at 7.  Counsel is not sure what the reference to the *nunc pro tunc* date of June 27 is

27  meant to convey.  The 5 days between June 27 and July 2, or the 11 days between June 27

28  and July 8, 2020 seem immaterial to the issues at hand.  But, in any event, the only

1    matters counsel conducted between June 27 and July 2 was email communication with

2    experts, investigators, potential second counsel, Sergeant Carrillo's family, resource

3    counsel, review of the complaint, prepare discovery letters and have a Zoom meeting with

4    Sergeant Carrillo on June 30, 2020.

5        Counsel could not do much more because the government did not produce the first

6    batch of discovery until July 17, 2020.  Counsel did not receive that discovery until July

7    20, 2020.

8        The government correctly observes: "Carrillo does not ask for any relief but

9    instead purports to provide 'notice' of his counsel's 'inability to constitutionally

10   represent' him without indefinite delay.  Dkt. 37 at 1."  Doc #39 at 9.  However, the

11   government then mixes Sergeant Carrillo's "non ask" with Mr. Justus's motion to compel

12   throughout the opposition.  Truly, the government owed an individual opposition to both

13   pleadings.  Elsewhere, the government stresses: "The overriding goal of the review

14   process is to allow proper individualized consideration of the appropriate factors relevant

15   to each case.  *Id*."  Doc #39 at 8-9.

16   **C.     Reply to the Government's Claim that the United States Death Penalty
             Process Timing is Reasonable**

17

18       The government claims that its timing for the death penalty process is reasonable.

19   The government says that "the United States Attorney intends to make that

20   recommendation approximately five months from when the defendants were first charged

21   by complaint and three and one-half months after first asking defendants for their

22   presentations."  Doc #39 at 9.  What the government fails to recognize is the fact that

23   while the complaint was filed on June 16, 2020 (Doc #1), counsel was not appointed until

24   July 2, 2020,[10] a two week difference, and that this Court did not make the formal

25   appointment until July 8, 2020, a three week difference.  Doc #22.  More significantly,

26

27   _____

28       [10]  June 27, 2020, if one goes by the *nunc pro tunc* date of appointment.

1   second counsel was not appointed until September 1, 2020, a 9 week difference.  Doc

2   #32.

3           Contrary to what the government claims, there is not "ample precedent for a death

4   penalty decision within the timeframe contemplated here."  Doc #39 at 9.  The

5   government tries to compare three distinguishable outlier pre-COVID-19 cases as ones

6   where "the United States completed the DPP and announced its death penalty decision

7   well within a year of charging."  *Id.;* citing the 2018 Pittsburgh synagogue shooting,

8   *United States v. Bowers*, No. 18-CR-292, Dkts. 1 & 86 (W.D. Penn.) (ten months between

9   complaint and notice of intent to seek death penalty), the 2015 Charleston church

10  shooting, *United States v. Roof*, No. 15-CR-472, Dkts. 1 & 164 (D.S.C.) (ten months

11  between indictment and notice of intent to seek death penalty), and the 2013 Boston

12  Marathon bombing, *United States v. Tsarnaev*, No. 13-CR-10200, Dkts. 3 & 167 (D.

13  Mass.) (nine months between complaint and notice of intent to seek death penalty).  Doc

14  #39 at 10-11.  While acknowledging that "[e]very case must be judged on its own facts,"

15  the government claims that these cases "are useful benchmarks."  Id. at 10.  They are not.

16          While the government notes, "[i]f the United States here is to make its decision on

17  the death penalty within a similar timeframe of one year from charging, the case must not

18  be unduly delayed at the first stage of the process" (Doc #39 at 10), it does not

19  acknowledge that there is no DOJ deadline established for making this determination.

20  The local United States Attorney has imposed the deadline on itself.

21          Before beginning the analysis of the three referenced cases, Sergeant Carrillo

22  wants to point out that these three cases do not control the timeframe issue.  Sergeant

23  Carrillo is not endorsing the *Bowers*, *Tsarnaev* or *Roof* timeframes in any way.  There are

24  many other cases where the time for making the local presentation and for making the

25  CCRC presentation was longer than the timeframe established in those cases and the

26  timeframe requested by the government in this case.

27

28

**1.     The Government's Case Comparisons are Inapt.**

The government uses three pre-COVID-19 inapt cases to claim that the five month period since Sergeant Carrillo was charged has given his counsel "a 'reasonable opportunity' to make a local mitigation presentation." Doc #39 at 5. The actual pre-Death Penalty Decision Submission (DPD) timelines of Dzhokhar Tsarnaev, Dylann Roof, and Robert Bowers' cases undermine the government's argument.

Factual comparisons of the circumstances of each of the cases show that they are outliers in the federal death penalty submission process and unlike Sergeant Carrillo's case in critical ways.

**2.     Defense Counsel in *Tsarnaev*, *Roof*, and *Bowers* had More Time to Prepare.**

Invoking *Tsarnaev*, *Roof*, and *Bowers* as precedent, the government focuses on the time from the filing of the complaint to the time of the filing of the government's notice of intent to seek the death penalty. But the duration of the full DPD process is not the relevant timeframe.

Here, and in the abstract, the relevant time periods are: (1) the time from appointment of counsel to the defense team's mitigation presentation to the local United States Attorney and (2) the time from appointment to defense counsel's presentation to the CCRC. Using these metrics, as shown in Table 1, counsel in *Tsarnaev*, *Roof*, and *Bowers* had over six months to prepare for their mitigation presentations.

**Table 1: *Tsarnaev*, *Roof*, and *Bowers* Counsel's Time to Prepare Mitigation**

| Case Name | Months from Appointment of First Counsel to Local Meeting | Months from Appointment of Full Team to Local Meeting | Months from Appointment of First Counsel to CCRC Meeting | Months from Appointment of Full Team to CCRC Meeting |
|---|---|---|---|---|
| *United States v. Tsarnaev* | 6.2 | 6.0 | 7.9 | 7.7 |
| *United States v. Roof* | NA | NA | 7.5 | 6.1 |
| *United States v. Bowers* | 6.6 | 5.0 | 8.7 | 7.1 |
| **AVERAGE** | 6.4 | 5.5 | 8.0 | 7.0 |

18

1     In *Tsarnaev*, three attorneys from the Federal Public Defender's office were
2  appointed on April 22, 2013, the same day the complaint was filed. *Tsarnaev*, Dkt. 13-
3  CR-10200, April 22, 2013, unnumbered docket entry. Lead counsel was appointed on
4  April 29, 2013. *Tsarnaev*, Doc #15. The local mitigation meeting occurred on October
5  28, 2013 and defense counsel presented to the CCRC on December 19, 2013. The first
6  appointed attorneys had 6.2 months to prepare for the local meeting and 7.9 months to
7  prepare for the CCRC meeting. The full four-attorney team had a similar 6.0 months to
8  prepare for the local meeting and 7.7 months to prepare for the CCRC meeting.

9     In *Roof*, two attorneys from the Federal Public Defender's office were appointed
10 on June 22, shortly after the June 17, 2015 offense. *Roof*, Dkt. 15-CR-472, Doc #26.
11 Lead counsel was appointed on July 23, 2015, one day after Roof was indicted. *Roof*,
12 Doc #2, #11. Second learned counsel was appointed on July 29, 2015. *Roof*, Doc #16.
13 As described further below, there was no formal local mitigation presentation to the
14 United States Attorney because he wanted to settle and accept Roof's guilty plea.[11]
15 Defense counsel presented to the CCRC on February 1, 2016. The initial defense team
16 had 7.5 months to prepare, and the full four-attorney team had 6.3 months to collect and
17 prepare mitigation evidence.

18    And in *Bowers*, two attorneys from the Federal Public Defender's office were
19 appointed on October 31, 2018, two days after Bowers was charged. *Bowers*, Dkt. 18-
20 CR-292, Doc #9. Learned counsel was appointed on December 19, 2018. *Bowers*, Doc
21 #41. The defense presented mitigation at the local meeting on May 19, 2019 and
22 presented to the CCRC on July 22, 2019. Initial defense counsel had 6.6 months to
23 prepare for the local meeting and 8.7 months to prepare for the CCRC presentation, while
24 the full team had 5.0 months and 7.1 months respectively.

25

26

27     [11] This information was obtained from defense counsel's conversations with
28 Dylann Roof's defense counsel, David Bruck, on October 14, 2020.

1    Here, the government seeks to require Sergeant Carrillo's counsel to present

2  mitigation to the local United States Attorney on November 12, 2020.  August 21, 2020

3  Government Email.  James Thomson was appointed on July 2, 2020.[12]  Doc #18.  This

4  timeline gives defense counsel only 4.3 months to prepare for the local mitigation

5  presentation.  Even using June 27, 2020 as the date of Thomson's appointment as the

6  government suggests still gives Sergeant Carrillo's defense team only 4.3 months and 5

7  days to gather and prepare mitigation evidence.  Doc #39 at 3 n.2.  This provides Sergeant

8  Carrillo's two counsel some **two months** less time to prepare than the four counsel had in

9  *Tsarnaev*, and *Roof*, and the three counsel had in *Bowers*.

10    But second counsel Kathryn Ross was not appointed until September 1, 2020.  Doc

11  #32.  This provides the full Carrillo team only 2.3 months to prepare.  Using Ross's

12  appointment date means that the Carrillo team will have some **three fewer months** to

13  prepare than the attorneys in cases that the government argues are comparable, as Table 2

14  demonstrates.  Contrary to the government's claim, there is not "ample precedent" to

15  support the compressed timeline proposed here.

16

17    **Table 2: Sergeant Carrillo's Counsel's Time to Prepare Compared to**
   **_Tsarnaev_, _Roof_, and _Bowers'_ Counsel**

18

| Case Name | Months from Appointment of First Counsel to Local Meeting | Months from Appointment of Full Team to Local Meeting | Months from Appointment of First Counsel to CRC Meeting | Months from Appointment of Full Team to CRC Meeting |
|---|---|---|---|---|
| *United States v. Tsarnaev* | 6.2 | 6.0 | 7.9 | 7.7 |
| *United States v. Roof* | NA | NA | 7.5 | 6.1 |
| *United States v. Bowers* | 6.6 | 5.0 | 8.7 | 7.1 |
| *United States v. Carrillo* | 4.3 (*proposed*) | 2.3 (*proposed*) | *TBD* | *TBD* |

28    [12] June 27, 2020, if one goes by the *nunc pro tunc* date of appointment.

### 3.   *Tsarnaev*, *Roof*, and *Bowers* are Distinguishable.

Judging *Tsarnaev*, *Roof*, and *Bowers* "on [their] own facts", as the government correctly asserts is necessary, further shows that they are distinguishable from Sergeant Carrillo's case in critical ways.

The 6.2 months between counsel's appointment and the local mitigation presentation in *Tsarnaev* masks the significant contact counsel had with Tsarnaev during that period.  Tsarnaev had four attorneys working on his case shortly after he was charged.  *Tsarnaev*, Doc #15.  During the over six months before the local mitigation meeting, "defense counsel ha[d] been meeting with [Tsarnaev] nearly every day or every other day since then, as well as actively investigating potential mitigating factors by meeting with his family members and others."  *Tsarnaev*, Doc #115 at 10.

The government also took an unusually aggressive approach to the DPD process, informing the court at a status conference on September 23, 2013 that it "intend[ed] to file any notice respecting seeking the death penalty as expeditiously as possible." *Tsarnaev*, Doc #104 at 12.  To achieve its goals of expedited processing, the government was willing to sacrifice defense input in the DPD process because it believed that the "U.S. Attorney in this case is fully aware of all the government's evidence . . . [therefore] the Attorney General does not need the defense's thorough consideration and commentary on all of it."  *Id.* at 17.  In doing so, the government set aside the Justice Manual's direction to give defense counsel "a reasonable opportunity to present *any* facts, including any mitigation factors for the consideration of the United States Attorney" and undermined its ability to make a well-informed determination.  USJM §§, 9-10.80 (emphasis added).

And even though the local United States Attorney controls the scheduling of the authorization meetings, the government invoked the CCRC as an external force setting the date by which the "death penalty authorization decision needs to be made."  *Tsarnaev* Doc #104 at 12; *see also id*. at 16 ("the deadline set by the death penalty protocol are simply internal . . . Department of Justice matters that the Attorney General has decided

1   upon . . .").  The United States Attorney alone made the arbitrary decision that it

2   "th[ought] that six months [to prepare mitigation] is a reasonable time in a case like this,"

3   without citation to authority or providing any support.  *Id.* at 17; Doc #115 at 2.  In fact,

4   the DPD timeline in *Tsarnaev* had no prior precedent and given its unusual procedure, the

5   government should not use it to establish precedent now.

6         Unlike Tsarnaev's four attorneys, Sergeant Carrillo's two attorneys have not been

7   able to meet with him in person and COVID-19 restrictions have curtailed his counsel's

8   ability to meet with family and gather mitigation from relevant organizations and

9   agencies.  Further, the government here has expressed a willingness to hear the mitigation

10  evidence Sergeant Carrillo's counsel is developing.  July 30, 2020 Government Letter;

11  August 21, 2020 Government Email; September 3, 2020 Government Email.  Thus, it

12  should not rely on a case in which the United States Attorney disregarded Justice Manual

13  directives in favor of an "expeditious" death penalty authorization.  *Tsarnaev*, Doc #104

14  at 12.

15        In *Roof*, the defendant and the court sought the abbreviated timeline from the

16  complaint to the CCRC mitigation meeting, and 7.5 months only elapsed because of the

17  government's own process and a concurrent state prosecution.  At Roof's arraignment on

18  July 31, 2015, defense counsel informed the court that "Mr. Roof has told us that he

19  wishes to plead guilty."  *Roof*, Dkt. 15-CR-472, Doc #26.  But counsel was "not able to

20  advise Mr. Roof to enter a plea of guilty" until the "government . . . decided whether it is

21  going to seek the death penalty."  *Id.*

22        Prior to the CCRC meeting, the United States Attorney and Roof's counsel were in

23  regular communication.[13]  The United States Attorney vigorously pushed for settlement

24  and lobbied the Attorney General against authorization.[14]  Meg Kinnard, *US Attorney*

25  _____

26       [13]  From defense counsel's conversations with Dylann Roof's defense counsel,
    David Bruck, on October 14, 2020.

27       [14]From defense counsel's conversations with Dylann Roof's defense counsel,

28  David Bruck, on October 14, 2020.

*steps down months before church shooting trial*, The Seattle Times (June 15, 2016) (United States Attorney "Nettles said that he spent hours in conversation with U.S. Attorney General Loretta Lynch as she contemplated whether the federal government would seek the death penalty against Roof."). There was no need for a local mitigation meeting because both the defense team and the United States Attorney agreed that the case should settle.

Because the case would proceed differently depending on the government's death penalty determination, the court asked the government to expedite the process. At an October 1, 2015 status conference, the court informed the attorneys that "[t]here are a lot of reasons, obviously we want [the death penalty determination] done as quickly as can reasonably be accomplished . . . the longer it lingers . . . it leaves a lot in doubt in this case." *Roof*, Doc #67 at 6. The court asked the Assistant United States Attorney to "communicate the Court's urging that the process proceed . . . as soon as can reasonably be accomplished. I want it to be a priority in the Department, because there are a lot of wheels that move based upon that decision." *Id*. at 7.

The court in *Roof* was similarly concerned about the concurrent state and federal prosecutions for the same offense. *Roof*, Doc #67 at 16. The Solicitor for the Ninth Judicial Circuit of South Carolina handling the state case wrote to the judge, stating that in her "20-plus years of prosecution at both the federal and state levels, I do not recall the Department of Justice actively pursuing a federal case while the State was in the midst of its prosecution." *Roof*, Doc #68 at 1. The court understood that the state judge set July 2016 as a trial date. *Roof*, Doc #67 at 16. The state requested that its trial proceed first, but the cases proceeded in tandem. *Roof*, Doc #68 at 2. Because of the concurrent state proceedings and the settlement negotiations, the court, the defense team, and the United States Attorney in *Roof* all wanted a rapid death penalty determination.

Here, Sergeant Carrillo has entered pleas of not guilty to all charges. Doc #18. The United States Attorney has not communicated that he will be advocating for settlement to the Attorney General. Neither Sergeant Carrillo nor this Court has asked the

1   government to proceed through the DPD process at unprecedented speed.  Sergeant

2   Carrillo is not facing concurrent state charges for this offense.  The personal decisions of

3   another defendant, and the idiosyncratic facts of a separate case in another jurisdiction,

4   should not be used to dictate the amount of time Sergeant Carrillo's counsel have to

5   prepare.

6          Finally, in *Bowers*, defense counsel without capital experience negotiated with the

7   government to identify an agreeable date for the mitigation presentations.  There,

8   attorneys from the Federal Public Defender's office were appointed on October 31, 2018.

9   *Bowers*, Dkt. 18-CR-292, Doc #9.  Neither attorney had capital case experience and they

10  moved the court to appoint learned counsel on December 19, 2018.  *Bowers*, Doc #41.

11  The court appointed learned counsel on December 27, 2018.  *Bowers*, Doc #43.  But in

12  the meantime, the government had provided notice to both the defense team and the court

13  of the DPD review process.  *Bowers*, Doc #35.

14         On December 7, 2018, the government informed the court that it had already

15  "communicated with defense counsel regarding the timing of defense submissions" and

16  informed the court that it would provide "a more detailed, anticipated schedule for the . . .

17  submission" after December 11, 2018.  *Bowers*, Doc #35.  Before learned counsel was

18  appointed, the government gave Bower's counsel merely one month and one week with

19  their client before asking them to determine how much time they needed to collect and

20  prepare mitigation evidence.  Bowers' non-capital counsel may well have underestimated

21  the importance of the local mitigation presentation and the time necessary to collect and

22  prepare mitigation evidence when they settled on presentation dates with the government.

23         The government also obscured the DPD process, claiming that "information

24  concerning the deliberative process may only be disclosed within the Department and its

25  investigative agencies as necessary to assist the review and decision making process."

26  *Bowers*, Doc #35 at 2.  In doing so, the government preemptively closed lines of

27  communication between it and the defense regarding mitigation presentations.

28         Sergeant Carrillo's counsel know what efforts they must take to fulfill their ethical

1   and constitutional duties to Sergeant Carrillo.  The short timeframe and the additional
2   obstacles created by COVID-19 restrictions have hindered their ability to collect
3   mitigation and prepare that evidence. And while the Bowers team started with only two
4   non-capital attorneys, three attorneys actively worked the case for five months before the
5   local mitigation meeting.  If the government's proposed dates stand, Sergeant Carrillo's
6   two counsel will not have nearly the same amount of time.  The unusually brief timeline
7   set by the government and Bowers' non-capital counsel should not limit the time Sergeant
8   Carrillo's counsel have to adequately prepare mitigation.

9                               **4.    Summation**

10          Far from acting as relevant precedent for the timeframe that provides defense
11   counsel a reasonable opportunity to prepare for the local and CCRC mitigation meetings,
12   *Tsarnaev*, *Roof*, and *Bowers* serve as cautionary cases that do not set the standard.[15]
13   Sergeant Carrillo and his defense team must have a reasonable time to prepare for the
14   local mitigation meeting tied to the specific circumstances and facts of his case.

15          A case that might provide a more useful reference is *United States v. Earnest*, Case
16   No. 19-cr-1850-AB filed in the Southern District of California (Poway Synagogue
17   Shooting).  One attorney from the Federal Public Defender's office was appointed on
18   May 14, 2019, shortly after the April 27, 2019 offense.  *Earnest,* Doc #11.  The
19   Indictment was filed on May 21, 2019.  *Earnest,* Doc #17.  That same day, another
20   attorney from the Federal Public Defender's office was appointed.  *Earnest,* Doc #18.
21   Two additional attorneys appeared on May 28, 2019.

22   _____

23          [15]  The government's pursuit of an expedited death penalty determination in
24   *Tsarnaev* may have contributed to the errors that lead the First Circuit to vacate
     Tsarnaev's death sentence on July 31, 2020.  *United States v. Tsarnaev*, 968 F.3d 24 (1st
25   Cir. 2020).  Had the government allowed defense counsel sufficient time to prepare for
     the mitigation presentations, enough time may have elapsed between the offense and the
26   trial to reduce the salience of the pretrial publicity.  The district court's failure to voir dire
27   jurors on the "kind and degree" of their "exposure to the case or the parties" through the
     media formed the basis of one error leading to vacation of Tsarnaev's death sentence.  *Id.*
28   at 35.

                                          25

1    The CCRC meeting was held on September 28, 2020.  *Earnest,* Doc #63 at 1-2,

2    Attachment L.  In short, the CCRC meeting was held 16 months and 14 days after the

3    appointment of counsel.  Significantly, by stipulation the parties agreed:

4         Cases in which the federal government seeks the death penalty are more
          complicated and take longer to bring to trial than cases in which the death
5         penalty is not sought because of additional investigation and preparation
          required and additional issues that typically must be litigated. Moreover,
6         recent events beyond the parties' control have hampered progress;
          specifically, mitigation investigation critical to a meaningful penalty phase
7         in a capital prosecution has been and continues to be hampered by the
          unprecedented COVID-19 pandemic. Without a determination of whether
8         the government intends to seek the death penalty or substantial clarity as
          to how this ongoing pandemic will continue to hamper efforts to prepare
9         for trial, the parties agree that at this time, it is not workable to set a trial
          date that will be meaningful and reliable.

10

11   *Earnest,* Doc #63 at 2, ¶5.

12        **D.    Reply to the Government's Specific Arguments Raised in the
                  Opposition**

13

14        The government claims that "Carrillo argues that the DPP does not set a particular

15   date for the United States Attorney's recommendation.  Dkt. 37 at 10."  Doc #39 at 10.

16   However, Sergeant Carrillo is not arguing anything.  He is simply representing that there

17   is no deadline - administratively, statutorily or judicially.  And the government does not

18   say otherwise.  Jumping 7 pages in the notice, the government then says: "[Sergeant

19   Carrillo writes that 'the timing is controlled by reasonableness, not arbitrary deadlines."

20   *Id.* at 17.  The government next says: "But there is nothing arbitrary about the timing

21   here.  It is the product of careful consideration of all the factors in play, as the United

22   States Attorney explained in a letter over two months ago notifying defense counsel of his

23   thinking and intentions on this matter.  Kopczynski Decl. Ex. A."  Doc #39 at 10.

24   Contrary to the government's claim, the letter did not explain away the arbitrariness.

25        The government groups Sergeant Carrillo in with Mr. Justus in claiming that 'both

26   defendants argue that the volume of discovery is too great to allow a mitigation

27   presentation at this time.  Dkt. 38 at 9; Dkt. 37 at 15."  Doc #39 at 10.  Not so.  Sergeant

28   Carrillo simply noted that he could not possibly review the amount of discovery produced

1    in the time frame the government was setting.  He made the specific point at the last

2    calling of the case.  August 19, 2020 Status Conference, Doc #31.

3         At the August 19, 2020 status conference, counsel advised the government and

4    notified the Court that the amount of discovery will require a vast amount of time to just

5    review - let alone analyze and then develop witness lists and an investigation plan, meet

6    with experts and become knowledgeable of the case facts.  Nevertheless, the Carrillo

7    team has been diligently pursuing these tasks.  Doc #37 at 11.  However, the case

8    investigation, retaining and initially consulting with experts and related service providers

9    did not start until the end of August.  And, while on-going, the defense case is not beyond

10   the beginning stage of discovery,  document collection and review and witness

11   identification.  Doc #37 at 11.

12        Indeed, since the filing of the notice, on October 9, 2020, the government has

13   generated another production of discovery.  The production includes approximately 1262

14   pages, 383 photographs, 3 audio files and 13 video files of discovery.  Government

15   October 9, 2020 Letter.  So, while many key items of discovery may have been produced

16   "months ago, *see* Dkt. 38 at 29–40, and [while] the overall volume of discovery in this

17   case [may] not [be] especially large by the standards of federal litigation"[16] (Doc #39 at

18   10), it will still take hundreds of hours of time to review the paper discovery and another

19   substantial amount of time to review the video and audio discovery files that have been

20   provided by the government to date.  And, since the government appears to have focused

21   on the facts as the controlling point for the submission, then surely the government would

22   want counsel to have the opportunity to read it, distribute it to experts and investigators

23   and analyze it before requiring the submission.

24        Sergeant Carrillo respectfully disagrees that he made "no effort to explain why the

25   ongoing review of such items prevents [him] from preparing a local mitigation

26   _____

27        [16]  The government does not explain what it means "by the standard of federal
     litigation."  All counsel knows is that there is a massive amount of discovery to digest and
28   the production is not yet at a close.

27

presentation." Doc #39 at 11. He explained the connection between the review of discovery and the submission as he just did in the paragraph above.

Oddly, the government comments: "Although Carrillo argues that he has sent discovery letters that are 'awaiting the government's response,' Dkt. 37 at 15, those letters request things like victim autopsy reports or a copy of Carrillo's criminal history report, despite the United States having already confirmed that Carrillo has no criminal history. Kopczynski Decl. ¶ 3." Doc #39 at 7. Sergeant Carrillo has written 19 discovery letters in this case, 11 of them were follow-up letters seeking clarification of items that were produced or seeking additional items in response to the substantive letter.

One of those letters concerned Sergeant Carrillo's criminal history information. That information was first requested in Discovery Letter #1 sent on July 2, 2020. Not receiving the information by September 10, 2020, Sergeant Carrillo sent Discovery Letter #12 again requesting it. On September 16, 2020, the government responded in an oblique way. In specific, the government stated: "in response to your September 10, 2020 letter regarding your client's criminal history, you are correct that we have produced no records because we are not aware of him having any prior criminal convictions." September 16, 2020 Government Letter. That response required Sergeant Carrillo to ask for further clarification and documentation of the fact that he has no criminal history. In specific, counsel requested the government to "provide a copy of the 'rap sheet' or FBI report that you received when requesting Sgt. Carrillo's criminal history information." Discovery Letter #18. The government responded 20 days later on October 9, 2020, and as noted in the opposition, confirmed that Sergeant "Carrillo has no criminal history." Doc #39 at 11 and AUSA Kopczynski Declaration, Doc 39-1 at 3. Part of the death penalty decision submission should indicate and discuss the defendant's criminal history, or as in Sergeant Carrillo's case - the lack of one. USJM 9-10.080A(5).

The other point worth note is that the government seems to belittle Sergeant Carrillo's counsels' efforts at acquiring the medical examiners' reports. Doc #39 at 11. What is troubling is that in a homicide case, counsel had to ask for them at all, or that

1   counsel had to ask for them twice.  Discovery Letters #1 and #14.  Not having the reports

2   until October 9, 2020 delayed any meaningful opportunity to meet and confer with our

3   forensic expert witnesses, which counsel has been trying to arrange since September 11,

4   2020.  In addition, an initial review of the October 9, 2020 discovery production reveals

5   that the government has only provided a draft of one of the medical examiner's reports.

6   Again, this information would certainly be made part of Sergeant Carrillo's submission.

7         Again, perhaps mixing Sergeant Carrillo in with Mr. Justus, the government says:

8   "Faced with similar arguments, courts in this district and elsewhere have roundly rejected

9   the notion that the DPP can proceed only after the production and defense review of

10  particular discovery."  Doc #39 at 11.  But, Sergeant Carrillo never said that the process

11  could not proceed without the production and review of discovery.  He simply noted that

12  he cannot read, absorb or analyze the amount of discovery in the timetable set by the

13  government.  Nor did Sergeant Carrillo ask for any discovery by this notice.

14        While not commenting on what Mr. Justus may have argued about needing to

15  "complete [his] factual investigation before [he] can make a local mitigation presentation,

16  *see, e.g.*, Dkt. 38 at 16–22" (citing Justus motion, but stating "they"), Sergeant Carrillo

17  never made that claim.  Sergeant Carrillo did say that some "aspects of their investigation,

18  such as in-person witness interviews and contact jail visits, are impossible while we

19  shelter in place, *see* Dkt. 37 at 20, 23."  Doc #39 at 11.  Sergeant Carrillo respectfully

20  disagrees that the "interference caused by shelter restrictions is not as extensive as

21  defendants claim, particularly at this point in the pandemic when practices like social

22  distancing and mask wearing have allowed many activities, essential and otherwise, to

23  carry on safely."  Governor Chris Christie's words are painful reminders of the effect of

24  the pandemic.  See Section V, *supra.*

25        The government misstates Sergeant Carrillo's position when it "equates the

26  preparation required for their local mitigation presentations with trial readiness."  Doc

27  #39 at 11.  The government misstates Sergeant Carrillo's point when it says: "Carrillo

28  claims that all the standards governing what it means to properly defend a capital case at

1  trial 'apply at the decision submission stage,' Dkt. 37 at 16."  Id.  While *Andrus* addresses

2  the effectiveness of counsel in the trial setting, the same guiding principles apply at the

3  decision submission stage - after all it is a - threshold life or death stage.  Doc #37 at 12.

4  Sergeant Carrillo did not cite any "authority for that extraordinary proposition" (Doc #39

5  at 11) because none is needed.

6         The Supreme Court cases and the ABA Guidelines are clear that capital counsel

7  must carry out the standard of care during all aspects of the case.  Whether a critical stage

8  is involved or not does not shield an attorney from the duty to follow the standard of care.

9  Whether a court would ultimately reverse a case because counsel failed to gather evidence

10  and present it to the local United States Attorney or the Capital Case Review Committee

11  misses the point.  The defendant has a right to expect his attorney to effectively prepare a

12  submission, and in doing so it should be done with the same thoroughness that the ABA

13  Guidelines require and the Supreme Court mandates.  For example, interviewing a

14  witness for the purpose of a death penalty decision submission cannot be done at a lesser

15  level than would be done for negotiation purposes or for trial.  The same operation

16  occurs.  Certainly, the government would not want to see defense counsel perform

17  ineffectively at this critical or significant stage.

18         And, contrary to the government's claim, this process does not "run[] contrary to a

19  core purpose of the DPP, which is to ensure that decisions about seeking the death penalty

20  are made well before trial."  Doc #39 at 12.  Allowing Sergeant Carrillo the opportunity

21  to prepare an adequate submission will not hamper the government from making its death

22  penalty decision well before trial.  That has not been a concern in any of the other capital

23  cases filed in this District.  No one has lodged such a complaint.

24         The government goes on about the significance of the local United States Attorney

25  recommendation, noting that Sergeant Carrillo claimed that the local United States

26  Attorney recommendation "'is typically given great deference.'  Dkt. 38 at 16; *see also*

27  Dkt. 37 at 17–18."  Doc #39 at 13, FN4.  The government asserts that Sergeant Carrillo

28  has "no basis to make this assertion because the local recommendation is confidential;

1    only the Attorney General's decision is public.  *See* JM 9-10.050."  Id.  The government

2    then chastises Sergeant Carrillo for citing "the so called 'Spencer report," (id) claiming

3    that "the source of that report's statements on the effect of the local recommendation is

4    unclear and may be nothing more than ipse dixit."  Id.  Yet, the government, without

5    support, blankly states that the report "does not reflect the DOJ's current practice."  Id.

6         Sergeant Carrillo never suggested that "[t]he review of the Capital Review

7    Committee and the Deputy Attorney General are [ ] simply a rubber stamp of the United

8    States Attorney's recommendation."  Id.  He merely stated the obvious.  The best place to

9    convince the government that the death penalty should not be sought is with the local

10   United States Attorney.  His recommendation has to carry more weight than defense

11   counsels' plea to not seek death.

12        True enough, Sergeant Carrillo has said that, at this time, "the combination of

13   shelter restrictions and the 'realities' of capital casework make it 'impossible' to say when

14   a local mitigation presentation could occur.  Dkt. 37 at 6, 15, 25–26."  Doc #39 at 12.

15   However, Sergeant Carrillo did not say "that his counsel cannot effectively represent him

16   for 'the foreseeable future.'  Dkt. 37 at 20."  Doc #39 at 12.  Sergeant Carrillo said:

17   "Constitutional jurisprudence, professional standards of responsibility, and the rules

18   governing federal prosecutors, set a high bar for attorneys in death penalty cases.  Under

19   the current landscape, and that of the foreseeable future, a dire consequence of the

20   pandemic is that no capital attorney can meet that bar."  Doc #37 at 16.

21        Without commenting on what Mr. Justus argued, Sergeant Carrillo never "argue[d]

22   in essence for the United States to violate another provision of the Justice Manual."  Id.

23   Sergeant Carrillo has no position as to the governments statement: "Each time the United

24   States Attorney requests an extension of the deadline to submit the case to the Capital

25   Review Committee, he 'must provide an estimated date by which the case will be

26   submitted for capital review.'  JM 9-10.060."  Id.  But in any event, of the hundreds of

27   defendants that have been charged capitally, surely not every defendant gave an estimate

28   of the sort the government is now claiming it must have to provide to DOJ.  Counsel's

1   own practice in this District has not encountered this purported dilemma.  Sergeant

2   Carrillo does not understand why the local United States Attorney cannot simply tell DOJ

3   the truth about the status of the case.

4       **E.     Reply to the Government's Claim that the Court Should Not Intervene**
            **into the Death Penalty Process Timeframe.**

5

6       As previously noted, Sergeant Carrillo is not asking for anything from the Court,

7   let alone "an injunction prohibiting the United States from moving forward with its

8   decision-making process on whether to seek the death penalty."  Doc #39 at 14.  Nor is

9   Sergeant Carrillo asking the Court to "intru[de] into the Executive Branch's prosecutorial

10  discretion." Id.

11      Whether DOJ's "internal procedures create [any] judicially enforceable rights"

12  misses the mark as to Sergeant Carrillo's notice.  Doc #39 at 14.  Moreover, Sergeant

13  Carrillo never said that "the timeframe contemplated by the United States Attorney"

14  violates[17] "the Justice Manual's 'reasonable opportunity provision.'"  Id.  Again without

15  commenting on Mr. Justus's argument, Sergeant Carrillo never contended that there was a

16  "statutory source of authority for defendants' extraordinary request to enjoin an internal

17  DOJ decision-making process."  Doc #39 at 14-15.  But, then again Sergeant Carrillo

18  never requested to enjoin anything, much less "an internal DOJ decision making process."

19  Id.

20      Again, without commenting on Mr. Justus's request, Sergeant Carrillo did not

21  claim "a constitutional source of authority for their request" because he did not make one.

22  Doc #39 at 15.  Nor did Sergeant "Carrillo offer[] the conclusory claim that the United

23  States" actions threaten violations of "due process and equal protection" as well as "the

24  Sixth and Eighth Amendments," Dkt. 37 at 14."  Doc #39 at 15.  He said: "For the

25  government to now ask Sergeant Carrillo to accelerate everything in play and make a life

26  or death presentation, in such a short time is irresponsible, violative of due process and

27

28      [17]  However, it does seem to run counter to it.

1    equal protection and rips at the heart of the Sixth and Eighth Amendments.  In short, it is

2    impossible to effectively accomplish these tasks by the government's imposed deadline."

3    He further said that "his counsel had a duty rooted in the Constitution 'to investigate the

4    case before acting in a way that could jeopardize the client.' (citing *Strickland*, 466 U.S.

5    668 and *Kimmelman*, 477 U.S. 365)."  Dkt. 37 at 10.

6         As addressed above, Sergeant Carrillo noted that requiring him to make any

7    submission under an arbitrary deadline would trespass on due process and equal

8    protection and erode the right to counsel all covered by the Fifth, Sixth and Eighth

9    Amendments.  He did cite "*United States v. Pena-Gonzalez*, 62 F. Supp. 2d 358, 363

10   (D.P.R. 1999), which held that the capital case review process is a "critical stage" of the

11   case that gives rise to a Sixth Amendment right to the assistance of counsel.  Dkt. 38 (sic)

12   at 32."  Doc #39 at 15.  And, the government found another case by the same judge

13   saying the same thing.  *United States v. Gomez-Olmeda*, 296 F. Supp. 2d 71, 78 (D.P.R.

14   2003).[18]  Sergeant Carrillo did not claim *Pena-Gonzalez* [or *Gomez-Olmeda*] have been

15   followed by other courts.  And, two of the three cases relied on by the government,

16   finding that the death penalty decision submission "is not a 'critical stage' of a criminal

17   proceeding for Sixth Amendment purposes" were cited by Sergeant Carrillo.  *Slone*, Doc

18   #37 at 31 and *Crusius*, Doc #37 at 29.  Indeed, Sergeant Carrillo referenced cases that

19   found the Court had jurisdiction to set or extend a DOJ deadline (Doc #37 at 27-29) and

20   those that did not find the Court had jurisdiction.  Doc #37 at 29-32.

21        Sergeant Carrillo referenced *United States v. Ablett*, Case No. 09-cr-0749-RS (JL),

22   Discovery Order at 1, Ablett Doc #73.  He said that "this District has previously held that

23   '[t]he pre-authorization phase of a potential capital case is analogous to the penalty phase

24   of a trial, and defense counsel must have access to all relevant discovery, in order to

25   provide effective assistance to Defendant.'"  Doc #37 at 32.  Counsel should have been

26   _____

27        [18]  Sergeant Carrillo cited the *Gomez-Olmeda* case for another point.  Doc #37 at

28   25.

33

1    more precise by indicating that the scope of their reliance was on the portion that "the

2    pretrial authorization phase of a potential capital case is analogous to the penalty phase of

3    the trial," (*Ablett* Order at 1).  He was not relying on the clause: "and defense counsel

4    must have access to all relevant discovery in order to provide effective assistance to

5    defendant."  Id.

6        In *Urbina*[19], District Court Judge Seaborg's statement below came during the

7    discussion of the motion for discovery, not during the motion for setting a case

8    management schedule.

9        [*Ablett*] was my case.  I referred the matter to Magistrate Judge Larson. .
     . . I never reviewed the decision that Judge Larson issued.  And, I will tell
10   you candidly, I would have reversed Judge Larson's decision' came during
     the discussion of motion for discovery not during the motion for setting a
11   case management conference.  Transcript, February 28, 2019, RT-38-40;
     Attachment M.

12

13   The issue was raised by other counsel.  Id.  In any event, Sergeant Carrillo referenced the

14   *Urbina* case as one in which the Court had determined it did not have jurisdiction

15   "regarding the timing of Committee proceedings[, which] are internal to the Department

16   of Justice."  *Urbina,* Doc #168, Doc #37, Attachment D.

17       The government then takes on counsel for identifying "*United States v.*

18   *Schlesinger* as an instance of a court 'finding jurisdiction' over the Department of

19   Justice's DPP, Dkt. 37 at 27, but in fact, the court said it was 'not convinced' that it had

20   jurisdiction, Dkt. 37-3."  Doc #39 at 17, FN5.  The government steps heavy in its

21   accusation.  Yes, Sergeant Carrillo should have added another sub-section entitled "Cases

22   Not Convinced of Having Jurisdiction" and included *Schlesinger* in that sub-section.  But,

23   counsel were hardly trying to hide the Court's ruling.  They attached the full order as

24   Attachment B to the Notice.  More importantly, counsel were not using the case as

25   authority for seeking an order from this Court.  They were simply advising the Court and

26   _____

27       [19]  Defense counsel Thomson and Shaffy Moeel filed two motions in *Urbina,*
     which other defendants joined.  They filed a motion for setting a case management
28   schedule and a motion for discovery.

34

1   the parties of what they had learned regarding the issue.

2        Again, the government seems to lump Mr. Justus's motion with Sergeant Carrillo's

3   notice when it claims that Sergeant "Carrillo's pleading is notable for the strength of its

4   language and the weakness of its evidentiary support."  Doc #39 at 18.  True enough,

5   Sergeant Carrillo noted that "the coronavirus 'paralyzes' and 'freezes' the defense

6   investigation", "that the shelter regulations represent an 'insurmountable impediment',

7   that is 'impossible' to overcome;" and "that while social distancing and travel restrictions

8   remain in place, a meaningful and reliable mitigation investigation 'cannot occur.'"  Id.

9   Sergeant Carrillo also remarked: "For the government to now ask Sergeant Carrillo to

10  accelerate everything in play and make a life or death presentation, in such a short time is

11  irresponsible, violative of due process and equal protection and rips at the heart of the

12  Sixth and Eighth Amendments."  Doc #37 at 14.

13       And, as the government noted, Sergeant Carrillo wrote that "his counsel would be

14  'foolish and unprofessional' in trying to give an estimate of 'when they might be ready to

15  make a defense mitigation presentation.'"  Doc #39 at 18.  However, the full statement

16  explains why the statement was made: "Counsel explained that to do so at this point,

17  would be foolish and unprofessional. 'We are at the beginning of the case.  We have yet

18  to meet our client in person.  Ms. Ross and I have yet to meet in person.  We have yet to

19  have a team meeting in person.  We only recently received the initial production of

20  mitigation discovery from you. . . . . In short, we have just begun our work.'"  Doc #37 at

21  15.  The government is correct that "Carrillo's counsel went even further, [noting] that

22  turning over a time estimate for a local DPP presentation 'might well compel us to turn

23  over our bar cards at the same time.'"  Doc #33-1 at 4.  But Sergeant Carrillo never took

24  "the position that any course other than indefinite delay 'invites potential error.'"  Doc

25  #39 at 8.  Sergeant Carrillo did not use the phrase "indefinite delay" in the notice.  Those

26  are the government's words.

27       Sergeant Carrillo provided as much of "a concrete discussion particularized to this

28  case of the obstacles they have encountered . . . .."  Doc #39 at 18.  He disputes the

1    assertion that the government's "timetable that is well within the range of reasonableness

2    of other, similar cases."  Id.  Quite the contrary, it is not at all reasonable and an outlier

3    timeframe.

4           The government then chastises Sergeant Carrillo's counsel for complaining about

5    the local contact visits with their client at Santa Rita, and saying that their "trial

6    investigation depends on contact visits, . . .."  Doc #39 at 6.  The government then adds

7    fuel to its fire by criticizing counsel for not "address[ing] this Court's offer to facilitate

8    contact visits, . . .."  The government is not privy to all.  On August 19, 2020, the same

9    day of the status conference and the offer by this Court, counsel emailed the Court's

10   Courtroom Deputy and informed her as follows:

11          I wanted you to know that I accept Judge Gonzalez Rogers's generous
            offer to schedule a meeting with my client at the Marshals office at the
12          courthouse.

13          However, at this time, I fall in the high risk category for the COVID virus.
            As it subsides, I will reach out to you about arranging a time that is
14          convenient to you and the Court.

15   Attachment N.  At this juncture of the case, the regular Zoom and telephone contact

16   meeting with Sergeant Carrillo[20] have worked because we do not have the full disclosure

17   of the mitigation records and are still acquiring and reviewing discovery.  But, when

18   ready, and it is safe, counsel will meet with Sergeant Carrillo per the Court's generous

19   offer.

20          Sergeant Carrillo never made or suggested a "premise that a local DPP mitigation

21   presentation must meet the standards of full trial readiness."  Doc #39 at 18-19.  He never

22   claimed "that documentary evidence may not be available to them . . .."  Id. at 18.  What

23   they said was that COVID-19 has made it far more difficult and time consuming to gather

24   records.  Nonetheless, counsel have actively been gathering records as part of their case

25   investigation.  And, the investigators have been duly reviewing them as they move

26

27          [20] Counsel still have concerns about the confidential nature of the zoom meetings

28   at Santa Rita.  But counsel are working around that impediment for now.

1    forward.  They also have been able to interview a core group of individuals.  But that is a

2    far cry from what is required to present an accurate and informed submission.

3           Finally, in AUSA Philip Kopczynski's declaration, he declares that he does "not

4    know what seven letters Carrillo's counsel has in mind.  As of Carrillo's filing, there

5    were, by my count, six letters outstanding."  Doc #39-1 at 3.  AUSA Kopczynski declares:

6    "We expect to complete our response to these six letters, including the two that remain

7    partially outstanding and one additional letter (concerning surveillance footage from

8    Oakland) within the next week."  Id.

9           On Friday, October 9, 2020, at the start of a three day holiday weekend and in the

10   midst of a substantial discovery production, AUSA Kopczynski "emailed Carrillo's

11   defense team asking them to inform [him] of any requests they believe remain

12   outstanding."  Doc #39-1 at 3.  During that time, counsel was going through the new

13   discovery to see if that production had provided any of the discovery requested in the

14   then, seven outstanding letters.   Perhaps counsel should have responded to AUSA

15   Kopczynski's email on October 13, advising him that we could not tell which letters were

16   still outstanding because we had not finished our initial review of the October 9, 2020

17   discovery production.  And for that error, we apologize.  Counsel assumed the

18   government wanted the defense team to review that discovery before responding so the

19   response would be complete.

20          In any event, since the government has now indicated that it "plan[ned] another

21   production for this week" (Doc #39-1 at 3), counsel would have had to repeat the same

22   process.  Waiting to review all of the discovery - especially if produced in response to

23   counsel's discovery letters - before advising the government of what letters remain

24   unanswered seemed prudent.  Anyway, counsel did not receive the "this week[s]"

25   production so the Carrillo team cannot answer AUSA Kopcynski's questions at this time.

26   But, we will do so when we receive the anticipated outstanding discovery.

27

28

## VII.   CONCLUSION

For the foregoing reasons, Sergeant Carrillo's counsel are not able to constitutionally present his death penalty decision submission by the unreasonable deadline arbitrarily imposed by the government at this time, and are unable to accurately estimate when they can present the submission.  However, they remain willing to meet and confer with the government to resolve this matter short of any further litigation.


DATED: October 19, 2020                    Respectfully submitted,

                                           */s/ James Thomson*
                                           _____
                                           JAMES THOMSON
                                           Attorney for Steven Carrillo

                                           */s/ Kathryn Ross*
                                           _____
                                           KATHRYN ROSS
                                           Attorney for Steven Carrillo

38